PETER RODES, Respondent, *v.* FREDERICK BRONSON, Executor, &c., Appellant.

A mortgage executed in 1851, to be paid in 1857, in gold or silver coin, lawful money of the United States, may be paid in United States legal tender notes, as such lawful money of the United States.

THIS cause came up on appeal from a judgment of the General Term, reversing a judgment of the Special Term, and dismissing the complaint, with costs.

On the 16th day of December, 1851, one Christian Metz and Barbara, his wife, executed to defendant, as executor, &c., of Arthur Bronson, deceased, a mortgage upon certain lands in Erie county, to secure the payment of $1,400, on the 1st day of January, 1857, "*in gold or silver coin, lawful money of the United States,*" with interest semi-annually on the first days of January and July in each year, in coin, as aforesaid. Such payments, both principal and interest, to be made in such place in the city of New York as Bronson shall appoint, and, in default of appointment, to be made to the credit of said Bronson, executor, &c., in the Merchants' Bank of said city.

Metz, on the 25th of March, 1853, conveyed the mortgaged premises to Rodes, the plaintiff, who assumed the payment of the mortgage, and paid the interest thereon as it accrued, up to and including the interest due January 1st, 1864. On the 10th of January, 1865, plaintiff tendered to defendant, in the city of New York, $1,507 in United States legal tender notes, and requested defendant to accept the same in payment of the mortgage, and to execute a discharge of the mortgage, which the defendant refused to do, on the ground that the mortgage should be paid in gold or silver, instead of legal tender notes.

At the time of the tender, the market value, in the city of New York, of the legal tender notes, as compared with gold or silver coin, was as one to two and twenty-five hundredths. This action was commenced in February, 1865, to obtain,

on the foregoing facts, a judgment that the mortgage be satisfied.

*John I. Townsend*, for the appellant.

*H. R. Selden* also submitted points for the appellant.

Respondent's points were submitted.

SMITH, J. By the terms of the mortgage executed by the plaintiff's vendor, he agreed "to pay the sum of one thousand four hundred dollars in gold or silver coin, lawful money of the United States."

What did the parties to the mortgage intend by the words, "gold or silver coin, lawful money," &c. ?

The counsel for the defendant claims, in his printed argument submitted to the court, that the "promised coin is not *currency*, but is a *commodity*, and is so treated by the contracting party;" and that "damages for the non-delivery of such commodity are to be measured, not by the number of coins promised, but by their *value* in treasury notes, the currency in which the judgment will be canceled." This is asserted, in the argument referred to, to be the radical position on which the claim of the defendant rests; and manifestly it is so. It is the essence of the entire argument submitted in his behalf.

Upon the assumption that the parties treated the promised coin as a commodity, and not as currency, the defendant encounters serious difficulties. In the first place, the parties did not specify the amount of the commodity to be delivered in payment of the debt expressed in the mortgage, nor the price at which it should be receivable, and consequently the obligation of the promisor was merely to deliver so much of the stipulated commodity as, at its market value, would cancel the debt. This will appear to be the true construction of the contract, if we exclude (as we should do upon the defendant's assumption) the idea that the promised article possesses the attribute of currency, and if we regard it as a commodity merely, like bullion or uncoined pieces of gold and silver, having no arbitrary or legal value affixed by the

stamp of the government. In this view, the word "coin" used in the agreement has no significance, except as a designation of the particular form of the commodity, and the words "lawful money of the United States" are merely descriptive of a particular species of the commodity, of which "gold or silver coin" is the generic term. Thus considered, the agreement is to pay a specified sum in a specified commodity; and the designation of the commodity as a medium of payment is the only circumstance that distinguishes the agreement from an ordinary contract to pay an expressed sum of money. The effect of the agreement is precisely the same as if it had provided for the payment of a specified sum in any ordinary chattel, as for example, in wheat, without fixing the price at which the chattel should be received. In that case, the promisor, if he chose to pay in wheat, instead of money, could turn it out at its market value at the stipulated time and place of payment. So here, the agreement is to pay fourteen hundred dollars "in gold or silver coin," not in currency, it is assumed, but in a specified *commodity*, to which the parties have not fixed a value by their agreement, and which, not being treated by them as currency, has no legal or determinate value except that which it will command in market. Regarding the stipulated article as a commodity purely, and assuming for the present that the promisor was under an absolute obligation to pay in that commodity, the utmost extent of his obligation was to pay or deliver so much of the specified article as was worth in market, at the stipulated time and place of payment, a sum equal to the amount of the debt secured by the mortgage.

But the defendant's counsel endeavors to obviate this difficulty by treating the promised article as a commodity for one purpose, and as currency for another; as a commodity, for the purpose of determining the mode or medium of payment, and as a currency, for the purpose of fixing the amount or quality of the commodity to be paid. He reasons thus: The plaintiff agreed to pay $1,400 in a certain commodity; that commodity is gold coin of the United States, each piece of which is stamped as a dollar, and is known as such in the cur-

rency of the country; therefore he was bound to pay 1,400 pieces of that description, or their equivalent. And as, at the time of his tender, each of those pieces was worth in market $2\frac{25}{100}$ dollars in treasury notes, the conclusion is reached that he ought to have tendered in such notes a sum equivalent to $1,400, and the interest thereon, multiplied by two and one-fourth. The fallacy of this reasoning consists in treating the stipulated article as currency, having a legal value as such, while assuming to treat it not as currency, but as a commodity merely, having no value except that which it bears in market.

In the next place, the defendant's position is inconsistent with the established rule of law, that a provision in a contract for the payment of an expressed sum, making such sum payable in a specific commodity, is for the benefit of the promisor, and he may pay the sum in the commodity, or in money, at his option, although the contract fixes a price at which the commodity shall be receivable. Thus, if the parties to the mortgage in question had gone further than they actually went, and had fixed the value at which the specified commodity should be received, as, for instance, by providing that a piece of gold of a specified weight and fineness should be valued at a specified sum, the promisor would not have been obliged to pay more than the amount of the debt expressed in the mortgage, with interest.

The case of *Penny* v. *Gleason* (5 Wend., 393) was upon a note whereby the defendant promised " to pay $79.50 in salt at fourteen shillings per barrel." The late Court for the Correction of Errors held that the measure of damages was the sum specified in the note, and not the value of the salt. Chancellor Walworth, delivering the leading opinion, cites with approbation Pothier, to the effect that these agreements for paying anything else in lieu of what is due, are always presumed to be made in favor of the debtor, and therefore he has always a right to pay the thing which is actually due, and the creditor cannot demand anything else. (2 Ev. Poth., 347, No. 497.) Chipman's Treatise on Contracts is also referred to, where the case is put of a note for $100, payable

in wheat at seventy-five cents a bushel, and the author concludes that it comes within the principle stated by Pothier, and says that if at the time fixed for payment wheat be at fifty cents a bushel, the debtor may pay in wheat at the rate of seventy-five cents, and that if the parties had intended the risk in the rise and fall of the wheat should be equal with both, the contract would have been simply for the payment of a certain number of bushels. (Chip. on Cont., 35.) There are other authorities to the same effect, cited in the present case by Judge Daniels in the court below. They proceed upon the ground that the expression of an amount of indebtedness raises the presumption that the promisor has received that amount or its value, and no more, and therefore he is not to be regarded as undertaking to pay more than that sum in any event. In the case at bar, it is unnecessary to resort to the presumption referred to, as the fact is found by the court that the mortgage was given to secure the repayment of the sum of fourteen hundred dollars borrowed of the mortgagee.

The obligation of the promisor would have been materially different if, without expressing any amount of indebtedness, or any certain sum to be paid by him, he had agreed to deliver or pay (it is immaterial which of these expressions had been used) on a day named, a specified quantity and quality of the stipulated commodity, as, for instance, a certain number of ounces of gold or of gold coin of a certain degree of fineness. In that case the measure of damages, in the event of his non-performance, would have been the market value of the article agreed to be delivered at the time and place of delivery. In the present case the measure of damages is the *sum* which the mortgagor agreed to pay, with interest, without reference to the value of the commodity in which it was payable.

Thus far the case has been considered upon the defendant's assumption that the contracting parties treated the specified coin as a commodity, and not as currency; but, in truth, that assumption is groundless. The parties stipulated that the sum expressed should be paid in the "lawful *money*

of the United States," to wit: "gold and silver coin." In the state of things which existed when the mortgage was executed, the stipulation was of no practical effect whatever, for without it the promisor would have been obliged to pay in metallic coin, which was the only money then recognized by our laws as a tender in the payment of debts. It is true certain foreign gold and silver coins were then receivable in payment of debts under the act of congress of March 3, 1843, but they were receivable at certain rates prescribed in the act which made them equal in value to the gold and silver coins of this country. At the time when the contract was made, the gold and silver coin of the United States was in common circulation as currency; it was the medium in which all other currency in circulation was redeemable, and it was not dealt in as a commodity unless in rare and exceptional cases. That state of things continued to exist until the mortgage became due in 1857, and for five years thereafter, during which its payment was forborne. At all times, from the execution of the mortgage till its maturity, the debt secured by it was liquidated, and was payable in the only lawful money of the country. When and by what process was it transformed into an unliquidated demand for the delivery of a commodity? Probably it never would have occurred to any one to suggest that such was its character, but for the legislation of congress in the act of February 25, 1862. At any rate, it may be safely asserted that even the defendant did not so regard the agreement previously to the passage of that act, unless in anticipation of legislation of that character, and with a view to avoid its effect if it should take place. So far as the contract was framed with that design, it is inoperative and ineffectual. The power of congress to authorize the issuing of treasury notes, and to declare them money and a legal tender in payment of debts contracted previously to the passage of the act by which such power is exercised, as well as those contracted subsequently, has been affirmed by this court. (27 N. Y., 400.) If the contract in question is to be excepted from the operation of the act of 1862, on the ground that it specifically provides for

payment *in coin*, the constitutional power of congress above referred to, as to preëxisting debts, may be completely annulled in the future by inserting a similar provision in all contracts for the payment of specified sums in money. The contract is to be read now precisely as it would have been read previously to the passage of that act, to wit, as a contract creating a debt, in a specified sum, payable in lawful money of the United States, and consequently payable in legal tender notes, which are lawful money and have a legal value equal to that of coin in the cancellation of debts.

It is said that this view of the case is unjust to the creditor. But it is not so, unless the interests of creditors are more to be regarded than the rights of debtors, and are paramount to even the vital needs of the government. It is well understood that in the case of a contract for the future delivery of a commodity of a stipulated quantity and quality, each party takes the risk of a rise or fall in its market value. So, in the case of a contract for the payment of a specified sum, in money, at a future day, each party takes a risk; the debtor, of an appreciation of the currency, the creditor, of its depreciation. It is immaterial whether the change in the value of the currency is caused by the operation of uncontrollable monetary laws, or by the direct exercise of the sovereign power of the government. In either case, it is within the risk. It must not be forgotten that in the extreme peril which threatened the United States in 1861, it was utterly impossible to procure the thousands of millions of dollars needed at the instant, as it were, to suppress the rebellion and preserve the federal government, without adopting some measure which would largely disturb all commercial value, by either raising or lowering the purchasing value of the currency, and thus bearing with severity upon either the creditor or the debtor class. The choice of measures, within the warrant of the Constitution, rested with the government itself. The parties to the mortgage in this case are presumed to have contracted in full knowledge that congress had power to authorize the issuing of paper money, and to declare it a lawful tender in payment of pre-

existing debts, as they did by the act of 1862, and the parties are presumed also to have known that such power of congress could not be restricted, hampered or evaded by a stipulation in the contract making the debt payable in metallic money. If by that legislation the value of the creditor's claim has been reduced, the same effect might have been caused, and to the same extent, without the agency of paper money, by simply debasing the gold and silver coin of the country to a sufficient degree, a measure unquestionably within the power of congress. A tender in such debased coin would have been a literal compliance with the contract, upon the defendant's own construction, but it would have been no better for him than was the tender which he refused.

The case of an agreement made since the act of 1862, for the payment of a specified sum *in coin*, in consideration of a loan in coin, or upon any other equivalent consideration, and in view of the difference in *market* value existing at the time between coin and treasury notes having the same *legal* value, may differ materially from the present case. The validity of such an agreement, for some purposes at least, is distinctly recognized by the act itself, and, in many cases, contracts of that character may accord with, and even aid, the policy of the statute. But it would be worse than useless to make the consideration of the present case an occasion for discussing one of the nature above suggested, and I have referred to the point, not for the purpose of expressing an opinion upon it, but to prevent misapprehension as to the scope of the decision.

The judgment should be affirmed.

Judgment affirmed.