DAVID SEARS, Jr., & others *vs.* SETH DEWING & another.[*]

A lease was executed upon condition of the lessee's "yielding and paying the yearly rent of four ounces, two pennyweights and twelve grains of pure gold, in coined money." *Held*, that the lessee was bound to deliver this amount of pure gold as a commodity, and that for a failure to do so he was liable in damages for the market value thereof, at the time when the rent became due, estimated in United States treasury notes.

CONTRACT brought to recover damages for non-payment of the rent reserved in a lease, executed on the 14th of August 1828, by which David Sears leased a parcel of land in Roxbury, for the term of one hundred years, to Edward Battles and Samuel Goodhue, their heirs, executors, administrators, successors and assigns, " upon condition of their punctually yielding and paying therefor and thereout, to the said David Sears, his heirs and assigns, the yearly rent of four ounces, two pennyweights and twelve grains of pure gold, in coined money, to be paid in four

---

[*] This case was from Norfolk County, and was argued in October, 1865, before BIGELOW, C. J., DEWEY, HOAR, GRAY and COLT, JJ., and again at the present sittings before BIGELOW, C. J., CHAPMAN, GRAY, FOSTER and WELLS, JJ.

equal and quarter-yearly payments, on the first days of the months of September, December, March and June, in each and every year hereafter, during such term, without any deduction, abatement, diminution or defalcation whatever, for or on account of any taxes, charges or assessments which shall or may hereafter at any time be assessed or laid, either on the hereby bargained premises or on the improvements thereof, or for or on account of any matter or cause whatever."

The following facts were agreed in the superior court: The rent sued for was for the five quarters ending June 1st 1864. Before the beginning of that period, the reversion had duly vested in the plaintiffs, and the term had come to the defendants by assignment. The rent reserved in the lease for each of those quarters had become due, and on each quarter day the defendants had offered to pay to the plaintiffs United States treasury notes, of various denominations, amounting to twenty-two dollars, except on one quarter day, when similar notes and postal currency were offered, amounting to twenty-one dollars and thirty-five cents; and on September 10th 1864, the defendants offered to the plaintiffs similar notes amounting to one hundred and ten dollars; all of which offers were declined.

One ounce and fifteen grains of pure gold were of much larger value in the market, at the time each quarter's rent became due, than United States treasury notes amounting according to their denominations to twenty-two dollars; and five ounces, three pennyweights and three grains of pure gold were of much larger value in the market than one hundred and ten dollars in United States treasury notes, on September 10th 1864.

It being agreed that the court should render such judgment as in their opinion was proper, and might if necessary send the case to an assessor to estimate the damages, judgment was rendered in the superior court for the defendants; and the plaintiffs appealed to this court.

*E. D. Sohier & C. A. Welch*, for the plaintiffs.

*E. M. Bigelow*, for the defendants.

GRAY, J. The controversy in this case arises upon that clause

Sears & others *v.* Dewing & another.

in a lease made on the 14th of August 1828, for the term of one hundred years, by which is reserved " the yearly rent of four ounces, two pennyweights and twelve grains of pure gold, in coined money, to be paid in four equal and quarter-yearly payments in each and every year hereafter during such term, without any deduction, abatement, diminution or defalcation whatever," for or on account of any taxes, charges or assessments, or of any matter or cause whatever.

The question of the legal construction and effect of this provision is a nice and difficult one. All the judges are agreed that if the stipulation to pay a certain weight of pure gold in coined money can be treated as a promise to deliver a commodity, the measure of damages is the market value of the commodity estimated in the same manner as the value of other commodities ; but that if it must be treated as a promise to pay money as money, then that money is its own measure of the amount to be paid. *Essex Co.* v. *Pacific Mills, ante,* 389. *Howe* v. *Nickerson, ante,* 400. The inquiry therefore is whether the thing to be paid is to be treated as a commodity, or as money.

This inquiry naturally divides itself into two questions : First, what was the intention of the parties to the contract ? Second, can the law carry out that intention ?

The intention of the parties to the contract is to be ascertained from a consideration of the language which they have used, giving it such a meaning as will, so far as possible, render every clause and phrase consistent and effectual, when applied to the subject matter to which it relates. To avoid unnecessary embarrassment, we shall in the first instance consider the intentions of the parties in the light of the state of the currency at the time when the contract was made and for many years afterwards, without regard to the more recent acts of congress making treasury notes a legal tender for the payment of debts.

The power to coin money and to regulate the value thereof and of foreign coin is universally held to be a prerogative of sovereignty, and is conferred by the Constitution upon the congress of the United States. The amount of alloy, the weight and fineness of the coin, its intrinsic value as compared with its

standard or nominal value, are subject to the arbitrary and absolute discretion of the sovereign power; and the experience of all ages and countries has shown that this discretion is often so exercised, upon grounds of supposed policy or convenience, as to debase the coin, and to enhance its nominal value as money above the real value of the metal which is contained in it.

When this lease was made, the only money which was a lawful tender in this country for the payment of debts was gold and silver coin struck at the mint of the United States under the act of congress of 1792, *c.* 16, which established the money unit at a dollar, of the value of a Spanish milled dollar as then current, and to contain three hundred and seventy-one and four sixteenths grains of pure silver or four hundred and sixteen grains of standard silver; provided for gold coins of the denomination of eagles, each of the value of ten dollars, and to contain two hundred and forty-seven and four eighths grains of pure gold or two hundred and seventy grains of standard gold, and for half and quarter eagles of corresponding weight and fineness; and fixed the proportional value of gold to silver at fifteen to one. U. S. St. 1792, *c.* 16, §§ 9, 11 ; 1 U. S. Sts. at Large, 248. Foreign gold coins, some of which had at previous times been declared by congress a legal tender for debts, had all ceased to be so. U. S. Sts. 1819, *c.* 97; 1821, *c.* 53 ; 1823, *cc.* 50, 53 ; 3 U. S. Sts. at Large, 525, 645, 777, 779.

By the terms of the lease, the yearly rent is to be " four ounces, two pennyweights and twelve grains of pure gold, in coined money." By the laws in force when it was made, this weight of pure gold would have been contained in eight eagles of ten dollars each, or eighty dollars, of the only gold currency which was then a legal tender for the payment of debts. If the intention of the parties had been merely to provide for a rent payable in money as money, it would have been much simpler to have fixed the yearly rent at eighty dollars. But, instead of doing this, they have not even used the word " dollars," or " eagles," or any other denomination of any kind of coin, or mentioned any coin in such a way as to afford the means of ascertaining, on the contract itself, what number of dollars will

now satisfy the contract. The thing to be paid is pure gold; the amount to be paid is to be estimated by the weight of the gold, and not by the weight or the money value of the coins which will contain the gold; and the form or vehicle in which this weight of pure gold is to be paid is coined money. The number and weight of the coins to be paid depend, not upon the rate at which they are current by law, but upon the weight of pure gold which they contain; not upon their arbitrary value as money, but upon their real and intrinsic value as metal. The legal value of the coins as money may vary; the amount of alloy may vary; nothing is fixed but the weight of pure gold which the coins must contain.

The lease is for the unusually long term of one hundred years. The leading object of the parties manifestly was to guard, as far as possible, against fluctuations in the rent, and against depreciation of money, and to secure the payment of a rent of a certain value at stated periods throughout the term of the lease. To carry out this purpose, they have taken for the measure of their rent, not a specified amount of money, but a specified weight of pure gold, unaffected by the size, weight, denomination or material of any coinage, or the amount of alloy contained in any coin. The contract is indeed to be satisfied by payment in the form of coined money. But the parties look at the money, not in its character or value as money, by reason of the value given to it as currency by legislation, but in its character and value as a commodity, according to the laws of trade, by reason of the weight of pure gold which it contains.

When this lease was made, the standard money value of gold as compared with silver was in the proportion of fifteen to one; its real value in the market was in the proportion of about sixteen to one. If the judgment for the amount of a quarter's rent in case of non-payment could only be for the amount of money which would be represented by so many gold coins of the United States as would contain the stipulated weight of pure gold, or two eagles, the lessee, by paying the judgment in silver coin, might have deprived the lessor of one sixteenth part of the real value of the gold which he had bargained for.

The purpose of guarding against depreciation of the coinage can only be carried out by treating this as a contract for the payment of gold in the shape of coin, considered as a commodity only, and not as money; for if it is a mere contract for the payment of that amount of money, considered as money, which will contain the stipulated weight of pure gold, then, although a legal debasement of the gold coin would not affect the value which the lessor would receive in case of a breach, yet a debasing of the silver coin only, without debasing the gold coin, would; and if, for example, the silver coin alone should be debased to half its former real value, then the lessee, by neglecting to pay a quarter's rent, and suffering judgment to pass against him for the amount of money which, if paid in gold, would contain the stipulated weight of pure gold, might satisfy that judgment by payment in silver coin depreciated to less than half the value of the gold coin.

The nature of this contract may be further illustrated by applying it to the state of the currency as established by law at different times since it was made. By the act of congress of 1834, *c.* 95, the weight of gold coins of the United States was diminished, and the proportion of alloy increased; by the act of 1837, *c.* 3, §§ 8, 10, the proportion of alloy was slightly diminished, without again varying the weight; and by the acts of 1834, *c.* 96, and 1843, *c.* 69 (now repealed by the act of 1857, *c.* 56,) certain foreign coins were to pass current as money in the United States. 4 U. S. Sts. at Large, 699, 700. 5 Ib. 137, 138, 607. 11 Ib. 163. While the acts last mentioned were in force the foreign coins thus made current as money by the sovereign authority were certainly "coined money" in the strictest sense, as much as if they had been coined by the same authority at its own mint. *Wade's case,* 5 Co. 114 *b.* Co. Lit. 207 *b.* 1 Hale P. C. 192, 210. The amount of coined money to be tendered in payment of the rent would therefore vary from time to time according to the weight of pure gold contained in the coins tendered. And even at one and the same time coins which were declared by law to be equivalent as money according to their denomination and stamp would not, if they contained

different amounts of pure gold, be equivalent for the purpose of paying this rent.

The act of 1834, *c.* 95, provided that eagles struck after the 31st of July, 1834, should contain two hundred and thirty-two grains of pure gold, or two hundred and fifty-eight grains of standard gold; and that all gold coins of the United States previously minted should be receivable in all payments at the rate of ninety-four and eight tenths cents per pennyweight, which was in proportion to the weight of pure gold which they contained as compared with the new coinage. This act, by diminishing the amount of pure gold in the gold money to be afterwards coined, and proportionally enhancing the money value of those previously coined, made it necessary for the lessee, in order to pay a quarter's rent, to tender gold coins having a greater value as money than he would have been obliged to tender before this act took effect.

A more striking illustration is afforded by the act of 1837, *c.* 3, §§ 8, 11, which, without altering the weight of the gold coins, provided that there should be only one tenth part of alloy, or two tenths of a grain less in an eagle than by the act of 1834; and that the gold coins issued since the 31st of July, 1834, should continue to be legal tenders of payment for their nominal values on the same terms as if they were of the coinage provided for by the act of 1837. The weight of pure gold at which the yearly rent was fixed by the lease (four ounces, two pennyweights and twelve grains) would be contained very nearly in $85.34 of gold money coined under the act of 1834, and in $85.27 of that coined since the act of 1837. The amount of the difference is small, but it is sufficient to test the principle; for there is nothing to prevent congress from making gold coins equally a lawful tender, which differ much more than this in the weight of pure gold which they respectively contain.

From 1837, then, there have been gold coins of two coinages, differing in the weight of pure gold which they contain, but both equally a legal tender for the same amount of money. The agreement to pay the rent is not a debt for a certain sum of money, but an agreement to pay a certain weight of pure gold

in the form of coined money. It may be satisfied by the payment of this weight of gold in money either of the coinage of 1834 or of the coinage of 1837. If it is to be treated as a debt payable in money as money, in what money is it to be computed? If in the coinage of 1834, it would be a larger amount of money; if in the coinage of 1837, a less amount of money. It is argued that the court cannot discriminate between two kinds of coinage which are declared by law to be equivalent as money. But if this is to be treated as a debt for money, the court, in order to ascertain the sum for which judgment shall be rendered, must discriminate and determine that it shall be paid in one coinage or the other, (the parties having made no discrimination, but allowing it to be paid in either,) thus making the very discrimination which it is said the law does not allow, and at the same time a discrimination which the parties have done their best to preclude. It is the weight of pure gold in either coin, that the parties have agreed to pay and receive; and by assessing the market value of the stipulated weight of pure gold in the shape of coined money the difficulty of making such a discrimination, and of any confusion between the two coinages, is avoided; for the weight and intrinsic value of the gold as a commodity in the market would not be affected by the nominal value of the coin containing it; and in assessing damages it would not be necessary to inquire what amount of coined money of either coinage would contain the requisite weight of pure gold, but what would be the value of that weight of pure gold, in whatever coinage contained.

The stipulated weight of pure gold must indeed, in order to satisfy all the requirements of the lease, be paid in the form of " coined money;" and we are inclined to think, and have assumed throughout this opinion, that this means only such coined money, whether domestic or foreign, as is by law, at the time of each payment, current in the United States and a lawful tender for the payment of debts generally. But this clause is subordinate and incidental only to the main purpose of the provision reserving as yearly rent a certain weight of pure gold, and should not unnecessarily be allowed to defeat that

purpose. And the parties have not agreed to take the government stamp on the coin as conclusive evidence of the amount of gold to be paid. By the act of 1849, *c.* 109, gold dollars of the same standard as other gold coins were authorized to be coined, and were declared for all sums whatever to be a legal tender for one dollar ; and each gold dollar might vary from the standard weight half a grain, or about two cents. 9 U. S. Sts. at Large, 397. Under this lease, the lessor is entitled to the stipulated weight of pure gold; if gold dollars are of light weight, though not varying from the standard more than the law allows, he is entitled to the more of them. He cannot be obliged to deduct one fiftieth part from any quarter's rent because the coins in which it is tendered are below the standard. The object of inserting in the lease the words " coined money " doubtless was to furnish a convenient test to assist the parties in ascertaining the amount of pure gold tendered, and one upon which they would ordinarily act; but they have not contracted to be absolutely concluded by it; and if the lessor stands upon his rights, he is not obliged to accept gold coined money of the United States, which if of the exact standard would, but which in fact does not, contain the weight of pure gold to which he is entitled.

On the other hand, the lessee may, by tendering coined money of the United States which contains more pure gold than the exact legal standard, and within the limit of variation allowed by law, satisfy the rent by the payment of a less amount of coined money. His obligation not being to pay any fixed amount of coined money, but so much coined money as will contain the requisite weight of pure gold, he may use for the purpose any kind of gold coins current as money which will contain so much pure gold, and is at liberty to select those which contain the least alloy and of which the smallest quantity is therefore sufficient to comply with the terms of the lease.

The contract does not require the court, in assessing damages, to ascertain what sum of money will contain the stipulated weight of pure gold, but what is the value of that weight of pure gold, in whatever kind of coined money contained. To

undertake to ascertain the amount of money which will contain this gold is to substitute a different rule of damages for that indicated in the contract itself, and one which tends to create unnecessary embarrassment and to defeat the manifest intention of the parties.

We have thus far considered the case as if nothing but metal coins had been made a legal tender for the payment of debts. Under the acts of congress making paper money such a tender, the rule for which the defendant contends, would to a still greater degree defeat the intention of the parties, and deprive the lessor of a larger portion of the value which the lease was carefully framed to secure to him.

For the reasons above stated, the court is of opinion that the intention of the parties, as manifested in their written contract, was to require the payment of a certain weight of pure gold in the form of coined money, considered as a commodity, and not as money, and to be estimated according to its market value as a commodity, and not according to the standard or money value of any coins that might contain it.

The next question is, Whether the law can carry out the intention of the parties to treat a certain weight of pure gold in the form of coined money of the United States as a commodity? And this depends upon the effect of the acts of congress.

It may be remarked, however, before proceeding to examine those acts, that gold and silver coins of a particular date or stamp often have a peculiar market value, either as objects of curiosity, or for use in trading with half civilized or savage nations, beyond their legal money value. If a collector of curious coins, or a merchant engaged in foreign trade, agrees to purchase a certain number of pieces of gold or silver money of the United States of a particular coinage, using distinct and apt words expressing an intention to buy them as a commodity and pays the market value thereof, and the other party fails to deliver them according to agreement, must the damages in an action against him for breach of the contract be limited to the nominal value of the coins?

The acts of congress contain no provision, such as has been

inserted in many English statutes, to prohibit the receiving or paying for coin more than its legal value as money. See *Sts.* 5 & 6 Ed. VI., *c.* 19; 6 & 7 W. III., *c.* 17; 7 & 8 W. III., *c.* 19, § 12; 51 G. III., *c.* 127, § 1. They do not for all purposes and under all circumstances declare treasury notes to be of the same value as gold coin, and interchangeable for one another of equal denominations, even considering both as money ; for duties payable to the United States on imports, judgments and executions for such duties and for penalties for the non-payment thereof, interest upon certain bonds and notes of the United States, and certificates of deposit issued by them for gold coin, are required to be paid in such coin. And the secretary of the treasury is authorized to receive deposits of gold coin and bullion, and to issue certificates therefor in denominations of not less than twenty dollars each, corresponding with the denominations of the United States notes; and also to issue certificates representing coin in the treasury, in payment of interest on the public debt; any of which certificates " shall be received at par in payment for duties on imports." U. S. Sts. 1862, *c.* 33, §§ 1, 2, 5; *c.* 45, § 2; *c.* 142, § 1 ; 1863, *c.* 73, §§ 2, 3, 5; 12 U. S. Sts. at Large, 345, 346, 370, 532, 710, 711. *Cheang-Kee* v. *United States*, 3 Wallace, 320. U. S. St. 1865, *c.* 80, § 12; 13 U. S. Sts. at Large, 494.

The difference in legal value, under some circumstances, between treasury notes and coined money, considering both as money, is clearly recognized by the act of 1865, *c.* 77, by which the secretary of the treasury was authorized to issue bonds or treasury notes on which the principal or interest, or both, might be " payable in coin or in other lawful money ; provided that the rate of interest on any such bonds or treasury notes, when payable in coin, shall not exceed six per centum per annum, and, when not payable in coin, shall not exceed seven and three tenths per centum per annum, and the rate and character of interest shall be expressed on all such bonds or treasury notes ; " and to dispose of the same, " for coin, or for other lawful money of the United States, or for any treasury notes, certificates of indebtedness, or certificates of deposit, or other representatives of value," issued

under any act of congress.　U. S. St. 1865, *c.* 77; 13 U. S. Sts. at Large, 468.　The treasury notes issued under this act, bearing interest at the yearly rate of seven and three tenths per cent. had this indorsement: " The government reserves the right of paying in coin the interest on this note at the rate of six per cent. per annum."

The acts of congress do more than this, and in many ways authorize coined money to be purchased and sold in the market as a commodity.　By the act of 1862, *c.* 45, § 1, "the secretary of the treasury may purchase coin with any of the bonds or notes of the United States, authorized by law, at such rates and upon such terms as he may deem most advantageous to the public interest."　12 U. S. Sts. at Large, 370.　And it is well known that the secretary of the treasury has freely exercised from time to time the power of selling as well as purchasing gold coin in the market.　But it is not the secretary of the treasury only who is authorized to do this by the laws of the United States. Many acts of congress, by necessary implication, if not in express words, contemplate and authorize dealing by individuals in gold coin as merchandise, like bullion.　By the internal revenue act of 1863, *c.* 74, §§ 4, 5, all contracts between individuals for the purchase or sale of gold or silver coin or bullion, to be performed after more than three days, were declared to be void, if not in writing, signed and stamped as therein required. By an act of June 17th 1864, *c.* 127, it was declared to be unlawful to make any contract for the purchase or sale of any gold coin or bullion to be delivered on any subsequent day, or upon any other terms than the actual delivery thereof and payment in full of the agreed price on the same day in United States notes or national currency, or not at the time in the actual possession of the person making the contract.　12 U. S. Sts. at Large, 719.　13 Ib. 132.　Both of these acts were declared not to apply to transactions by or with the United States ; and by regulating the manner in which, and specifying the circumstances under which, contracts between individuals for the purchase and sale of gold coins might be made for a price payable in treasury notes of the United States, and declaring all such contracts not so

made to be wholly void, directly authorized the purchase and sale of gold by individuals in the manner and under the circum- stances so pointed out. And the repeal of the act of June 17th 1864, in a fortnight after its passage, by the act of July 2d 1864, *c.* 209, enlarged this authority. 13 U. S. Sts. at Large, 344.

By the internal revenue acts of 1862, 1864 and 1865, brokers are required to pay an excise of fifty dollars for a license ; and any person whose business is to purchase or sell stocks, bullion, " coined money," bank notes or other securities, is to be regarded as a broker. 12 U. S. Sts. at Large, 457. 13 Ib. 252, 472.

By the internal revenue act of 1865, *c.* 78, " incomes derived from interest upon notes, bonds and other securities of the United States, and also all premiums on gold and coupons, shall be included in estimating incomes " upon which a tax is to be assessed. 13 U. S. Sts. at Large, 479. By the acts o. 1866, *c.* 15, §§ 3, 4, and *c.* 184, § 9, all persons required to make returns of income and articles or objects charged with an internal tax are required to declare in the return whether the rates and amounts therein " are stated according to their values in legal tender currency, or according to their values in coined money ; " and if they are " stated in coined money," the assessor is to reduce them " to their equivalent in legal tender currency, according to the value of such coined money " at the time ; and the lists furnished by assessors to collectors must state the sums " in legal tender currency only." 14 U. S. Sts. at Large, 5, 147.

Under the laws of the United States, then, a merchant who imports goods cannot pay the duties in treasury notes, but must pay them in coined money, or in such securities of the United States, other than ordinary treasury notes, as are declared by law to be equivalent to coin. The secretary of the treasury may sell in the market the gold coin received by him for duties, and the merchant may lawfully buy it (as he might have bought it when he first needed it for the payment of the duties) through a broker licensed by the United States to deal in " coined money." If he buys such gold coin for treasury notes, or sells his goods for gold coin, or if he receives any gold coin from the United States in payment of interest on their bonds held by him, he

must, in the return of the income and profits of his business to the assessor of internal revenue, estimate the gold coin which he so obtains, not at its nominal value as fixed by the laws of the United States as money, but at its real and intrinsic value at the time as merchandise in the market, as fixed by the laws of trade.

The conclusion seems to follow that the particular composition and form of metal which has been selected by the government as a medium of currency has not been thereby rendered incapable of being treated as merchandise; but that citizens of the United States are required in some cases, and not prohibited in any, to deal with gold coined money of the United States as a commodity, instead of regarding it as money, and to estimate it at its market value as merchandise, instead of at its denomination as money.

We are not aware of any adjudication inconsistent with this conclusion. In *Bush* v. *Baldrey*, 11 Allen, 369, the point adjudged was that gold coins of the United States, received and applied towards the payment of a debt, without any special agreement as to the rate at which they should be taken, must be estimated at their legal value as money; and no question was raised as to the power of the parties to deal with the value of the metal contained in the coin, as a commodity. In *Wood* v. *Bullens*, 6 Allen, 516, *Howe* v. *Nickerson, ante,* 400, and *Tufts* v. *Plymouth Gold Mining Co. ante,* 407, in this court, and like cases in other courts cited in *Howe* v. *Nickerson,* the contract or obligation was for the payment of a certain number of dollars expressed on the face of the contract, and in the strictest sense a debt, within the meaning of the acts of congress authorizing the issue of treasury notes, which provide that they shall " be lawful money and a legal tender in payment of all debts, public and private, within the United States," except duties on imports and. interest on certain securities of the United States. But these words cannot be applied to contracts for the payment or delivery of specific chattels or commodities. And in one of those cases the court of appeals of New York said: " The obligation of the promisor would have been materially different if, without expressing any

amount of indebtedness, or any certain sum to be paid by him, he had agreed to deliver or pay (it is immaterial which of these expressions had been used) on a day named a specified quantity and quality of the stipulated commodity, as, for instance, a certain number of ounces of gold or of gold coin of a certain degree of fineness.  In that case, the measure of damages, in the event of his non-performance, would have been the market value of the article agreed to be delivered at the time and place of delivery." *Rodes* v. *Bronson*, 34 N. Y. 653.  *Kimpton* v. *Bronson*, 45 Barb. 625, 626 ; S. P.

The majority of the court is therefore of opinion that there is no legal objection to carrying out the intention of the parties to this contract, as manifested in the language of the contract itself, by treating the stipulated weight of pure gold in the form of coined money, with the amount of alloy incidental to its existence in that shape, as a commodity, and assessing damages for the failure to pay or deliver it, according to its market value as such, as in the case of breach of a contract to deliver any other commodity.

The only remaining question is of the principle upon which the market value of this commodity is to be assessed; and upon this question, if it is to be treated as a commodity, the opinion of the court is unanimous that it must be assessed as of the time when each quarter's rent became due by the terms of the lease, in that kind of currency in use as lawful money, which is the most common, and in which therefore, in the absence of special agreement or usage, all values of commodities in the market are estimated, namely, in treasury notes of the United States, made by acts of congress a lawful tender for the payment of debts between individuals : and that those acts, deliberately passed by the congress and put in force by the executive department of the United States in carrying out a system and policy which they deemed proper and necessary to the effectual exercise of the supreme powers vested in the national government by the Constitution ; which involve no principle of liberty, but merely the nature of the currency and the mode of assessing damages for breach of contracts; upon the basis of

which the whole business of the country for five years has been conducted; and the validity of which, though not passed upon by the final arbiter of such questions, the supreme court of the United States, has been recognized by the executives and legislatures of many states, and by the judgment of the highest court of every state in which it has been disputed; * cannot, in the face of such a weight of concurrent authority, legislative, executive and judicial, and of practical construction by the people for years in a matter affecting their daily business, be now declared by this court, upon theoretical objections, to be so clearly unconstitutional as not to have the force of law in this commonwealth. *Essex Co.* v. *Pacific Mills, ante,* 389. To such a case, in a court whose jurisdiction is limited to a single state, the words of Chief Justice Marshall in an analogous case apply with peculiar force: " A doubtful question, one on which human reason may pause, and the human judgment be suspended, in the decision of which the great principles of liberty are not concerned," " if not put at rest by the practice of the government, ought to receive a considerable impression from that practice. An exposition of the Constitution, deliberately established by legislative acts, on the faith of which an immense property has been advanced, ought not to be lightly disregarded." *M' Culloch* v. *Maryland,* 4 Wheat. 401.

*Judgment for the plaintiffs; case referred to an assessor.*

---

* Upon this point, the following cases were cited in the argument: *Metropolitan Bank* v. *Van Dyck,* 27 N. Y. 400; *Shollenberger* v. *Brinton,* 52 Penn. State R. 1 ; *Reynolds* v. *Bank of Indiana,* 18 Indiana, 467; *Thayer* v. *Hedges,* 23 Indiana, 141; *Breitenbach* v. *Turner,* 18 Wisconsin, 140; *George* v. *Concord,* 45 N. H. 434; *Van Huson* v. *Kanouse,* 13 Mich. 305; *Hintrager* v. *Bates,* 18 Iowa, 174; *Hague* v. *Powers,* 39 Barb. 427; *Lick* v. *Faulkner,* 25 California, 404; *Appel* v. *Woltmann,* 38 Missouri, 194 ; *Latham's case,* 1 Court of Claims R. 149. See also *Carpenter* v. *Northfield Bank,* 39 Verm. 46.