## N. Y. SUPERIOR COURT.

### John M. Taylor agt. Morris Ketchum, and others.

Where *coin and securities* are purchased by a *broker* for and held by him for his principal, under an agreement, for a valuable consideration, to carry the securities beyond a certain time, and to hold and not to sell the coin under a specified sum, the *title* to the coin and securities remains in the principal; and if the broker sells them contrary to the agreement, without notice of the time and place of sale, he is liable in damages for a conversion of the property.

An offer to prove a custom or usage, that a broker buying stocks for his principal, need not preserve for delivery the indentical stocks purchased, but it is sufficient to deliver or sell an equal quantity in value and amount of stocks of the same character; and that on failure of the principal to reimburse his broker, the latter may sell the stocks without notice of the time and place of sale, is not applicable to such a case. Such proposed proof is in contradiction of the contract, and clearly against the rules of law.

If the transaction is a mere loan of securities for the broker's use, a return of other stocks of like nature, kind and amount is sufficient.

In an action to recover damages for the conversion of the plaintiff's property, which is gold coin, the measure of damages is properly reached by fixing the value of the coin in currency; and this is the highest market price of the coin converted, between the time of the taking and that of the trial.

*General Term, October,* 1867.

This case comes up on exceptions directed to be heard in the first instance, at general term, and on appeal from an order denying a new trial at special term. The plaintiff's action is brought to recover damages for the conversion by defendants of securities, consisting of United States bonds placed in the defendants' hands by the plaintiff to be taken care of by them, and for selling gold coin placed in their hands to be sold when it reached a certain price; alleging that defendants sold the gold for less than they were instructed to receive therefor in currency, thus violating the plaintiff's directions.

The particulars of the plaintiff's causes of action are set forth in his complaint, in four distinct specifications; the second was dismissed upon the trial. The first is, that in April, 1864, through C. L. Sailsbury, the plaintiff deposited with the defendants the sum of $10,000, and directed the

purchase of United States stocks to the amount of $100,000, upon the defendants' agreement to hold or carry such stock upon a margin or advance by the plaintiff of ten per cent so long as the plaintiff should desire; then alleges the purchase by the defendants of $164,000 government stocks, to wit: $114,000 of United States six per cent bonds of 1881, and $50,000 of United States 7.30 notes; then charges and alleges sales in violation of an agreement to carry the bonds and notes indefinitely, and particularly beyond January, 1865; that United States 6's of 1881 were sold by defendants to the par amount of $51,000, at the rate of 106½, on the 27th of September, 1864; and on the 18th of November, 1864, the defendants sold the par amount of $50,000 of United States 6's of 1881 at 110, and $1,300 of said bonds at 110½; and on the 22d of November, 1864, sold the said $50,000 of United States 7.30 notes at the rate of 116½; that the market rates of the United States 7.30 notes on the day of the alleged sale of said $50,000 of said notes, sold at 118; that the stocks of 1881 were on 7th of December and 1st of January, 1865, worth at the rate of 118, and the 7.30's during the time the defendants agreed to hold the same worth at the rate of $126.65; that such sales were not for the fair market price; were in violation of the agreement to hold the said stocks after January 1, 1865, and without notice, right or lawful authority on the part of the defendants, to the plaintiff's damage.

*Third.* That in September, and before the 20th of October, 1864, the plaintiff deposited with the defendants $77,565 in gold coin, in the city of New York, with instructions to hold and not to sell for less than $250 in currency to $100 in coin; to which instructions defendants agreed; that in violation of the instructions and agreement, without notice sold $67,000 of the coin at less than $250; on the 21st of October, $40,000, at 208¼, and $7,000 at 208⅛; on the 22d of October, 1864, $100,000 at 210⅝, and $100,000 at 210¾, and on the 9th of November, 1864, the balance of the gold

coin was sold for $250 ; that in the month of November, said coin was worth $2.64 in currency, by which wrongful sales plaintiff lost $45,000. The fourth count alleges a fraudulent conversion of the securities and coin to the use of the defendants. The answer of defendants admits : (1.) The co-partnership of the defendants doing business in the city of New York, under the firm name of Ketchum, Sons & Co.; (2.) Denies the causes of action set up in the complaint; (3.) Sets out an account stated, accord and satisfaction and ratification of all the acts of defendants by the plaintiff; (4.) A counterclaim for money paid, amounting to $6,722.96, with interest from February 1, 1865. The reply puts the counterclaim in issue by a denial. The evidence shows the United States stocks and securities in the hands of the defendants were purchased for the plaintiff's benefit in the first place, evidently intended to be upon a ten per cent margin; but when the securities bought exceeded $100,000, a new arrangement was talked of between the parties, for after the 10th of April, 1864, and the 15th of April, the purchase amounted to $164,000, instead of the $100,000, and finally, about the 12th of July, an arrangement was made by the defendants to hold the securities till after the 1st of January, 1865 ; the securities were sold in June, without notice to plaintiff, and no mention was made of the sale when the agreement to hold was made in July. Other evidence was given of the price of the securities in January, 1865. In regard to the gold, it appeared that the defendants received $67,000 in gold coin, with instructions to hold the same for $250 ; all of which was sold for less than that amount, contrary to instructions. The sum of $10,565, which was sold at 250, is not in controversy, and no claim is made by the plaintiff for damages on account of that sale. There was in evidence accounts of the transactions sent to plaintiff by defendants, telegrams and letters passing between the parties directly and through Sailsbury, their agent, containing instructions, directions and reports of transactions and remittances,

from which the defendants claimed the plaintiff acquiesced in the disposition made of the coin and securities made by the defendants, with full knowledge of all facts; but the jury found specially upon this question against the defendants. The jury also found a general verdict for the plaintiff for $45,901.63, and the court directed the exceptions to be heard in the first instance at the general term. Most of the exceptions taken upon the trial arise upon the exclusion of evidence and objections taken to the charge of the court, which sufficiently appear in the opinion.

F. N. BANGS, *for defendants.*
EDWARDS PIERREPONT, *for plaintiff.*

*By the court,* GARVIN, J. To sustain this action the plaintiff was bound to show title in himself to the securities and coin for the conversion of which it is brought. There was abundant evidence to sustain the verdict, provided that question is to turn simply upon the issues found by the jury. Upon the first question, that of title, the property either belonged to the plaintiff or the defendants, and it will hardly be contended that the defendants were the owners of the coin or securities. Irrespective of the defendants' lien thereon, there can be no doubt that the plaintiff was the owner and had the right to call upon the defendants at any time to deliver him the securities and coin upon payment of their commissions. They doubtless had a lien thereon for their advances, but beyond this they had no rights in the property of the plaintiff, except such as they possessed by virtue of any contract and arrangement between the parties. The defendants' letters, telegrams, notices, reports of sales, and demands for further margins, all proceed upon the theory that the coin and bonds belonged to the plaintiff, and were his property. We must therefore assume the title to both coin and securities was in the plaintiff, held by the defendants for him. Of this there was abundant evidence; in fact,

it was not disputed, either as to the $67,000 in coin, or the $114,000 United States bonds.

There is evidence that the gold was to be held for 250 in currency, and there is also evidence of an agreement to carry the bonds until after the 1st of January, 1865, and there is no evidence in the case contradicting it; if there had been, that question is settled by the verdict. It is not disputed that the bonds were sold by the defendants in September and November, 1864, for prices ranging from 106½ to 110–110½, and that on the 7th of December, United States bonds were worth 118. Thus there is proof tending to show the title to the property in the plaintiff both as to the coin and bonds. (2.) Sale of the property—of the coin for less than 250, and of the bonds before the 1st of January, 1865. Upon this evidence alone without anything else, it would present a clear case of title in the plaintiff and conversion by the defendants, for which he would be entitled to damages, provided the sales were made without authority from the plaintiff. Of this authority there is no evidence in the case.

As to the bonds, the question of notice to the plaintiff of time and place of sale has nothing to do with the case, if the defendants agreed to hold the bonds till after the 1st of January, 1865. Nor as to the coin, if the instructions to hold the coin for 250 were binding upon the defendants. In such case whether there was a notice of time and place of sale or not is of no importance, unless the plaintiff authorized it before the sale or ratified it afterwards. Of authority to sell there is no proof, and the jury have expressly found the plaintiff did not acquiesce in the disposition made by the defendants of the coin or securities, with full knowledge of all the facts relating thereto.

This brings us to the objections and exceptions taken by the defendants: (1.) To the rulings of the court in receiving and excluding evidence. (2.) Denying the motion to dismiss the complaint, and (3.) exceptions to the rulings of the court in connection with the charge to the jury. Without

going over in detail each particular exception taken by the defendants to the exclusion of evidence offered, to the admission of that received, it is apparent that the same questions of law are presented, substantially, by the exceptions taken to the charge of the court, with one qualification, and that pertains to the evidence of custom and usage, which was offered and rejected. It will, therefore, only be necessary to pass upon the exceptions taken to the charge; to determine all the questions presented for review, holding, as we do, that the motion to dismiss the complaint was properly overruled, and that the several motions to compel the plaintiff to elect upon which count, transaction or cause of action he would proceed, were rightly disposed of. (*Lansing* agt. *Wiswell*, 5 *Denio*, 213.)

Upon the exclusion by the court of the evidence of custom and usage, the courts have held that usage is not admissible to contradict the contract, and that no usage is admissible to control the rules of law (34 *N. Y. R.* 417; 16 *N. Y. R.* 393). The admission of the evidence would have been a violation of both these principles. The contract proved was to carry the bonds which the defendants held for the plaintiff, and as defendants' security for their advances and commissions until after the first of January, 1865. Defendants sold before that period, without notice of the time or place of sale.

The offer was to prove a usage that a broker buying stocks for his principal need not preserve for delivery the identical stocks purchased, but it is sufficient to deliver or sell an equal quantity in value and amount of stocks of the same character; and that on failure of the principal to re-imburse his broker, the latter might sell the stocks without notice of the time and place of sale. If the transaction had been a mere loan of securities for the defendants' use a return of other stocks of like nature, kind and amount would be sufficient; but where stocks or securities are held as security for advances, the rule is different. In such case the title to the

security remains unchanged. That is the rule as established by the courts (*Dykers* agt. *Allen*, 7 *Hill*, 497). The proof offered of custom and usage, authorizing a sale of stocks on failure to re-pay advances, without notice of time or place of sale, was properly excluded. This has been so often held that it hardly needs the citation of authorities to sustain it. If the broker desires to possess himself of this power he must make an agreement that shall permit him to do so. Upon both these propositions we think the rulings of the court should be sustained (*Dykers* agt. *Allen; Chase* agt. *Prime*, 4 *Johnson's Ch. Rep.* 490; *Wheeler* agt. *Newbould*, 16 *N. Y. R.* 392). The proposed proof of usage was in contradiction of the contract, and clearly against the rules of law (*Bowen* agt. *Newell*, 4 *Selden*, 190; *Merchants' Bank* agt. *Woodruff*, 6 *Hill*, 176; *and cases cited by Mr. Hill; Higgins* agt. *Moore*, 34 *N. Y. R.* 417).

It is also quite plain that if there was an agreement to carry the bonds till after January, 1865, their sale was unauthorized; and whether there was such an agreement or not, a sale without notice of time or place was unauthorized either by the terms of the contract as proved, or by the rules of law. All the questions of fact were put to the jury after stating the theory of the plaintiff's case. Upon the facts, the court say : If you find the facts to be in both cases (meaning coin and securities), as plaintiff claims, he is entitled to such damages. It is true the court instructed the jury that the plaintiff put the securities into the hands of the defendants to be held for their advances, but this was upon the uncontradicted evidence of the case, and was perfectly proper (20 *N. Y. R.* 126); but upon the question of what the contract was as to instructions in regard to holding the coin and appropriating the securities, the question of fact was expressly submitted to them. Upon the other exceptions taken to the rejection and admission of evidence, we think the rulings of the court should be sustained.

*Second.* Several exceptions were taken to the charge, some

o which are already disposed of by the views thus far taken of the case; those remaining to be considered are : (1.) It is claimed the court erred in withdrawing from the jury the first question in writing submitted to their consideration. The submission of the question in this form was purely discretionary. The language of the Code is "the court may direct the jury to find a special verdict" (§ 261). It was of no importance whether done or not, and its withdrawal from their consideration furnishes no ground of exception. Both questions might have been withdrawn without harm to either party before the jury had agreed upon their verdict.

It is not like the case of issues framed by the court, sent down to the circuit for trial, upon which special findings are required upon specified issues. The court withdrew the first question in writing from the consideration of the jury, and instructed them they need not answer it. This, we think, the court had the right and power to do, and was purely a matter of discretion over which we have no control. Thus far this is a case of a breach of both contracts by the defendants, in regard to the coin and the securities, and therefore a breach of duty in violating the agreements, and a conversion of the property to the defendants' use, resulting in loss, by the plaintiff, of large gains and profits in the sale thereof, had the coin and securities been held as directed by the plaintiff and agreed to by the defendants. The only remaining question is one of damages. The court adopted the rule laid down in *Scott* agt. *Rogers* (31 *N. Y. R.* 676), which was more favorable to the defendants than that afterwards promulgated by the same court in *Borst* agt. *Dutcher* (34 *N. Y.* 493.) Certainly, whatever the rule is, if there is any difference in the two cases, the defendants have no cause to complain, as the rule laid down on the trial is most favorable to them. This disposes of the question of damages in regard to the conversion of the bonds.

But other objections and exceptions are presented regarding the transactions in gold. (1.) To the admission of the

evidence fixing the value of coin in currency, and adopting that price as the measure of damages in the charge of the court to the jury. We think the rulings of the court were right.

The court of appeals simply holds that treasury notes are a legal tender in payment of debts between private persons (27 *N. Y. R.* 400); and that a mortgage which, by its terms, is payable in gold or silver coin, may be paid in United States legal tender notes, and that such notes are the lawful money of the United States. (*Rodes* agt. *Bronson,* 34 *N. Y.* 649.)

This action is not brought to enforce the payment of a debt, but to recover damages for the conversion of the plaintiff's property.

A judgment may be paid in treasury notes, and the plaintiff cannot demand gold or silver therefor. How is the plaintiff to obtain indemnity for his loss, unless the value of the coin, in currency, is made the measure of damages? There never may be a time after the trial when coin would bring the same price it would before. Any other rule would work great injustice.

The rule of damages is the highest market price of the property converted, between the time of the taking and that of the trial. (34 *N. Y. R.* 493.) This market price, recovered and put in judgment, becomes a debt. The defendants may pay and satisfy it by the tender and payment of treasury notes. The plaintiff cannot demand gold or silver coin in payment of his judgment, but must take the treasury notes. We must, therefore, in view of the case of *Metropolitan Bank* agt. *The Shoe and Leather Bank* (27 *N. Y. R.* 400), hold that the rulings of the court were right in receiving the evidence and submitting the question of the value of the coin to the jury.

There were some other exceptions, none of which were well taken.

Entertaining these views, the exceptions taken by the

defendants should be overruled, and a judgment entered for the plaintiff with costs, and the order denying a new trial should be affirmed with costs.

McCUNN, J.   The principal questions in this case to be disposed of by the court are:

*First.* Was there an agreement on the part of the defendants to carry the securities placed in their hands by the plaintiff until the 1st of January, 1865?

*Second.* Did the defendants render to the plaintiff accounts of the disposition of such securities and gold, which accounts showed a balance in defendants' favor, and in which the plaintiff acquiesced, after the accounts were rendered, with a full knowledge of all the facts relating thereto? And did the rendering amount to an account stated between the parties, so as to bind the plaintiff?

The rulings of the court, and the points raised by the parties to the action during the progress of the trial, being of secondary importance, I shall hastily touch thereon.

In considering the first question, the only doubt presented is, whether the learned chief justice was justified in withdrawing that question from the jury. I think he was; for the facts as to that question were so clear and uncontradicted that it did not require the action of the jury to pass upon them so as to enable the court to apply the law. The witness Salisbury testifies, at folio 38, that the defendants were to purchase and carry stocks for the plaintiff, and at folio 75 he says the agreement was to carry them to the 1st of January; and the clear instructions to be found in the letter of plaintiff to defendants, of the 17th of October, 1865 (Ex. 14), were to the effect that all the gold bought for plaintiff, and that sent by plaintiff to defendants, should be held until it reached 250. And it will be observed that these instructions were reiterated from time to time, until all the gold was placed in the hands of defendants, to be carried by them for plaintiff. I cannot find a tittle of proof in the case to the

contrary of this. It is true, the counsel for defendants claim that out of the lengthy correspondence by letters and telegraph there is evidence going to show that no agreement was made to carry the gold and securities until January, 1865, but that we must impliedly take it, no such understanding, as to carrying into January, existed. I can see no implied agreement in such letters and telegrams to vary the former express contract on the part of the defendants to carry the United States bonds and the gold. The parties had a long running account between each other, on the one side as bankers here, on the other as bankers in St. Louis, dating long before this special agreement and continuing to the time when the dispute about the sales arose. And it was concerning this account that the letters and telegrams were sent and received; and whenever the letters, or telegrams, or accounts, related to the gold and bonds in dispute, they simply related to them as they were held as collateral securities, or as pledges, given by plaintiff to defendants, to secure other banking transactions. Those letters and telegrams were never intended as authority from plaintiff to defendants to sell the bonds and gold without the proper notice and demand required in all cases where pledges of the like kind are made. Indeed, the learned chief justice, in his charge, said that the defendants had no other rights than those of ordinary pledgees, without any special rights, and in that instruction he is justified in a series of decisions, which must be recognized as the law on the subject. (*Willard's Eq. Jur.* 456, *and the numerous cases cited therein.*)

In all pledges, before a sale takes place, there must be a demand, and that demand must be seasonable in time, and there must be a notice of the sale. Now, in this case, it is conceded there was no notice or demand, neither was there waiver of such notice or demand; yet, without the one or the other, defendants had no right to sell the securities. In *Wilson* agt. *Little* (2 *N. Y. R.* 443), it was held that a waiver of notice was not a waiver of demand; and in the case of

*Genet* agt. *Howland* (45 *Barb.* 560), it was held that notice was not equivalent to a demand.

In *Milliken* agt. *Dehon* (27 *N. Y. R.* 364), there was a consignment of cotton, and the consignor was to keep the margin good; and it was held that the consignee could not sell in that case; that he must demand the margin before selling. He had leave by contract to sell without notice, but that was not enough; demand was not waived. The question in that case was whether a demand was necessary, and the necessity was declared by the court.

In *Andrews* agt. *Clarke* (3 *Bosw. R.* 585), it was held that the plaintiff was not in default, so that the defendants had a right to sell, though they had given him notice that they anticipated a fall on a certain day; that the pledgee could not sell without the fall first occurring, and then giving him notice, so as to cut off his equity of redemption. And in *Merwin* agt. *Hamilton* (2 *Duer. R.* 244, 251), the pledgees were held liable because they did not make demand of payment and give notice of sale.

In the case of *Durant* agt. *Einstein*, heard in August last (*reported ante*, *p.* 223), there is an opinion of this court, at special term; where all the above authorities are discussed, and where the court held that a party's property could not be sold at will, and without first making a demand upon him, and then giving him notice of the sale, in order that he may be enabled to prevent its being sacrificed. So that I think I have shown that the learned judge below was justified in withholding from the jury the question of the agreement to carry the gold and bonds for plaintiff, and that he was also justified in saying to the jury "that these parties (the defendants) are entitled to have applied to their dealings neither more beneficial nor harsher principles of law than other members of the community, and that the dealings of brokers in stocks or securities are not by their necessities or the customs they adopt taken out of the general rule. That a party who has chattels, or securities, or property of any

kind, pledged to him for the payment of a debt, without some express agreement to that effect, has no other authority than what he derives as pledgee or mortgagee of that stock or chattel, and has no right to sell it without giving notice to the person who owns it of the time and place of sale, so that he may be enabled to raise the money by that time to take up the loan." There was no notice of time and place of sale, and therefore the sale was unwarranted.

The next question is, how far did the accounts rendered by defendants to plaintiff bind the latter, and did these accounts act as a bar to this action? It is claimed by defendants that they rendered accounts to plaintiff, in which they stated the sales of all the securities at certain prices and at certain times; that they rendered an account of certain sums of money which they have expended for him; and they claim that, taking into consideration all the circumstances, the relations in which the parties stood to each other, the communications by telegraph, by letter, and through Salisbury, it is clear that the accounts were rendered to plaintiff, with a full knowledge on his part of all his rights and all their liabilities, and that he accepted the balance that was therein set forth against himself, and thereby ratified all their acts in the disposition of his property. The plaintiff denies all this, and says that he never accepted said accounts as binding on him; on the contrary, that he never gave the defendants color of authority that would lead them to suppose that he had, by receiving these accounts, ratified or sanctioned their acts in the premises. On this second question, there was testimony on both sides, and the court left it for the jury to say which side was correct in its assertions, and the jury found for plaintiff. I therefore hold on this point that the jury's findings in this respect must be final and conclusive.

The less difficult and less important questions, such as the ruling on evidence, the charge of the learned judge, and the

request to charge, I think I can show to have no virtue in them.

As to the motion on the part of the defendants' counsel, asking the court to charge forty-two separate and distinct propositions, a large number of them being mere repetitions of former requests; these requests were presented in a body, and I hold that it is not the duty of the court to undergo the labor of considering them together. On the contrary, the counsel should have submitted and read each proposition separately and in detail, so that the court would have been enabled to deliberate and pass upon each distinct proposition. I hold, therefore, the rule to be that each proposition, or request to charge, should be distinctly and separately made; and a refusal on the part of the court to charge these forty-two propositions in bulk, other than as he had charged, is not error.

Next, as to the charge: A general exception to a charge, as in this case, taken after the charge was delivered, is not specific enough to raise or present any question for reversal. (*Newell* agt. *Dolby,* 33 *N. Y. R.* 85; *Jones* agt. *Osgood,* 2 *Seld.* 233.)

"It is the duty of counsel to point out, at the time, in what respect the charge did not conform to the requests; and it is not the duty of the court, by comparing every portion, to see if there is a discrepancy. Perhaps, if attention had been called to the precise point of which complaint was to be made, it would have been corrected. The party complaining *must put his finger on the point* of which he complains." (*Jones* agt. *Osgood, supra.*)

Last. The court committed no error in ruling on the evidence. The objection to the letter of Salisbury was not well taken, because defendants had not first inquired about such communication. It was right, therefore, to have the subject matter exhausted.

The agreement was a positive undertaking on the part of the defendants to carry certain specific securities, and to

carry gold, until its price advanced to 250; and, as the custom of brokers, even if admitted, could not vary a positive agreement, the custom was properly ruled out. The custom of brokers, in not preserving the identity of .stocks purchased by brokers for parties, was immaterial, because even the substituted securities, which defendants were said to have supplied for plaintiff, were sold without demand or notice.

Judgment should be affirmed, with costs.