ROBINSON, J.—I concur in holding the defendants liable for the breach of their duty as forwarders.

LARREMORE, J.—I think the defendants are liable as forwarders, and that the judgment should be reversed.

Judgment reversed.

---

THE PEOPLE OF THE STATE OF NEW YORK AND EDWARD HOGAN *against* BANKSON T. MORGAN.*

The offices of justices of the peace, District Court justices and police justices of the city of New York are distinct offices, and the latter are not embraced under the title of "justices of the peace" as that term is used in section 18 of Article 6 of the Constitution of this State as amended in 1869, by which it is provided that " the electors of the several towns shall * * * *elect* justices of the peace," and the legislature may, therefore, provide for the *appointment* of such police justices, without violating that provision of the Constitution.

Nor are such police justices county officers.

An act providing for the removal of the then existing police justices in the city of New York, and the appointment of their successors, and regulating the duties of such justices and the details of these courts, embraces but one subject, and this subject is expressed (within the meaning of section 16 of Article 3 of the Constitution of this State, which provides that the subject of a private or local bill " shall be expressed in the title,") by the words " An act to secure better administration in the Police Courts of the city of New York."

APPEAL from a judgment of this court entered on the verdict of a jury, rendered under the direction of the court at trial term.

The object of the action was to test the constitutionality of of L. 1873, c. 538.

---

* Affirmed by the Court of Appeals in 58 N. Y. 679.

The complaint alleged that at an election duly held according to the laws of this State, at and in and for the city and county of New York, on the first Tuesday of December, 1869, the said Edward Hogan, plaintiff, had been duly elected by the votes of the electors of said city and county to the office of police justice in and for the first judicial district of said city and county for the term of six years from the first day of January, 1870. That a certificate of his said election had been in due form duly issued to him by the proper officers. That he had duly qualified for such office, and thereafter on the said first day of January, 1870, entered into the possession of said office and upon the performance of the duties thereof, and continued to discharge the same until on the fourth day of November, 1873, the said defendant usurped and intruded into said office, and had ever since unlawfully held and exercised the same, and excluded the said Edward Hogan, plaintiff, therefrom.

The answer alleged that in pursuance of the provisions of chapter 538 of the Laws of 1873, entitled " An act to secure better administration in the Police Courts of the city of New York," the defendant and nine others had been duly appointed police justices of the city of New York on October 23d, 1873, and had duly qualified, and on November 4th, 1873, had entered into the possession of the said offices, and had ever since held the same.

The defendant further denied that he had excluded the plaintiff Edward Hogan from any office; but defendant charged, that at the time when the said ten persons so appointed police justices acquired their powers as such, to wit, on November 4th, 1873, the tenure, salaries, and authority of the plaintiff Edward Hogan, and of eight other persons claiming to have been elected police justices at elections held in the respective judicial districts of the city of New York, did, by the provisions of said act, cease and determine.

On the trial all the facts stated in the answer were shown, and the only point raised by the plaintiff's counsel was, that the act of 1873 was unconstitutional. The court held the act to be constitutional, and directed a verdict for the plaintiff.

*W. A. Beach* and *Elbridge T. Gerry*, for appellant.

In December, 1869, nine police justices were elected in and for the city and county of New York, to hold office for six years, from January 1, 1870.

By an act of the Legislature, passed May 17, 1873 (L. 1873, p. 884), entitled "An act to secure better administration in the Police Courts of the city of New York," it was declared, that "all provisions of law for the election of police justices in the city of New York are hereby abolished, and all such justices in said city shall hereafter be appointed." The act provides for the appointment of police justices, through nomination of the mayor, and confirmation by the common council; and provides that the powers then appertaining to any police justice shall be vested in the new appointees; and thereupon that "the tenure, salaries, and authority of the police justices theretofore existing in said city, shall cease and determine." The act requires the then existing police justices to deliver to those appointed under it all papers, documents and records pertaining to their office. The appointed justices are given "the like access and possession, in respect of the court houses," that were enjoyed by said existing justices. The act removes the clerks, assistants, stenographers, and attendants of the then existing police courts, and authorizes the new board of police justices to appoint substitutes. It provides for the preparation, and printing annually, of statistical reports of crime in said city, and of "deficiencies in criminal administration, and suggestions of remedies for the same;" and of the amount and kind of business done at each of the police courts; the services performed by each police clerk, and the compensation paid, and various other matters. It requires the board of police to supply attendants upon the police courts from the police force. It prohibits all persons, other than members of the bar of the State, from practicing before said courts, except in their own defense. It provides for the removal of police justices and clerks by the Court of Common Pleas.

By virtue of this act, the elected police justices have been displaced, and their jurisdiction, powers, and places assumed

by others, appointed by the mayor, and confirmed by the common council.

I. The act "to secure better administration in the Police Courts of the city of New York" (L. 1873, ch. 538, p. 844), which provides for the appointment of ten "police justices" in the city of New York, is unconstitutional, in that it, in reality, provides for the appointment of ten justices of the peace in that city, in direct violation of article 6, section 18, of the Constitution of this State, as amended in 1870, which declares that justices of the peace shall be elected in the different cities of this State.

The police justices of the city of New York, existing at the time of the adoption of the Constitution, were and are justices of the peace, within the letter and spirit of said articles and sections.

II. If the preceding proposition be erroneous, the act of 1873 is, nevertheless, repugnant to section 2 of article 10 of the Constitution, and void.

By section 2 of article 10, "all county officers whose election or appointment is not provided for by this Constitution shall be elected by the electors of the respective counties, or appointed by the boards of supervisors, or other county authorities, as the Legislature shall direct."

If police justices be county officers, they cannot be appointed by the mayor and common council.

These are not "county authorities" within the sense of the Constitution.

The territorial identity of the city and county of New York does not merge the distinctive character of the officers of each. Police justices have been judicially held to be county officers (*The People* v. *Edmonds*, 15 Barb. 529 ; *Same Case on Appeal*, 19 Barb. 468).

The act of 1857 (L. 1857, vol. 2, p. 761), provides that police justices shall be elected for the *city and county* of New York.

Section 19 of article 6, as it now stands, does not affect this proposition. It makes all "judicial officers" elective or appointive, as the Legislature may direct, except as otherwise

provided. It is to be read in connection with section 2 of article 10. That requires the election or appointment by "county authorities," of all county officers whose election or appointment is not otherwise provided for by the Constitution. That is such a provision for election or appointment as avoids the application of section 19 of article 6.

This question, however, is not to be determined by the phraseology of section 19, as appearing in the amended judiciary article. That did not take effect until 1870 (*Richter* v. *Poppenhusen*, 42 N. Y. 373 ; *The People* v. *Gardner*, 45 N. Y. 812). Section 2 of article 10 is to be construed in connection with the provisions of the Constitution as originally adopted. No such enactment as now contained in section 19 of article 6 then existed.

On the contrary, section 18 of the original article required all judicial officers of *cities* and *villages* to be elected. It had no application to *county* officers, and as to them left section 2 of article 10 fully operative.

Section 19 of the present sixth article was not intended to qualify the policy declared by section 2 of article 10, either as to county or city officers. The true construction of the section limits the general language of the latter clause to the special subject-matter of the preceding part. It all has relation only to inferior local courts thereafter created. Section 18 evidences the intent of the Legislature to preserve the system of election and appointment as it existed at the time of the adoption of the amended article. Justices of the peace for county and city, and district court justices for the city, were continued elective; and to other judicial city officers it applied the principle of section 2 of article 10.

This section (19) did not take effect until January, 1870 (*Ely* v. *Holton*, 15 N. Y. 596 ; 42 N. Y. 270 ; 45 N. Y. 812). It related, therefore, only to inferior local courts, subsequently established, and could not affect those already in existence. The corresponding provision of the Constitution of 1846 (article 6, section 14) contained no direction concerning the election or appointment of these officers. That was regulated by sec-

tion 18 of that Constitution, making all judicial officers of cities elective.

III. The act under consideration is unconstitutional, inasmuch as it shortens the tenure of the police justices, and removes them from office. They were elected in December, 1869, to hold office for six years (L. 1851, p. 957; L. 1852, p. 51). They were in office January 1st, 1870. If justices of the peace they were continued in office for their respective terms by section 25 of the amended sixth article of the Constitution (*People* v. *Gardner*, 45 N. Y. 812; *Same* v. *Bell*, 46 Id. 57).

If this may be done by constitutional amendment, the argument returns, that section 19 of article 6 does not effect that result, in face of section 25 of the same article, and section 2 of article 10. Section 25 continues justices of the peace in office. Section 2 is unaffected by section 19 of amended article 6, leaving these police justices, as county officers, to be elected, or appointed by the board of supervisors, or other " county authorities." The mayor and common council of New York do not fall within that description.

The act is in conflict with the policy of the judiciary article of the Constitution. That looks to the election of officers of this character. It is declared as to justices of the peace and district court justices. If police justices do not technically belong to the former class, their functions as conservators of the peace are the same. Police justices and district court justices, in cities, combine all the powers of justices of the peace in the country. No reason can be given for any distinction in the mode of appointment or election. The obvious purpose of the Constitution was to make them all elective. The first clause of section 18 provides for the election of justices of the peace in the several *towns*. The next, for the election in *cities* of officers carrying the same jurisdiction as country justices of the peace. No discrimination should be made, or was intended to be made. No substantial reason can be given why officers of the same class should be elected in the country and appointed in the city.

IV. The act is also void under section 16 of article of the

Constitution, requiring all local acts to embrace but one subject, to be expressed in the title.

1. This is a local act. "An act is local, within the meaning of the Constitution, which in its subjects relates but to a portion of the people of the State, or to their property; and may not, either in its subject, operation, or immediate and necessary results, affect the people of the State or their property in general" (*People* v. *Supervisors*, 43 N. Y. 130; *Same* v. *Allen*, 42 Id. 378; *Same* v. *O'Brien*, 38 Id. 193; *Same* v. *Hills*, 35 Id. 449; *Huber* v. *The People*, 49 Id. 132; see cases collected, 7 Abb. N. S. 1, note; *Matter of Walker*, 2 Duer, 655).

2. The title of this act does not express its subject. It professes to be "An act to secure better administration in the Police Courts of the city of New York." The eleven first sections have not the slightest allusion to that subject. They do not concern, in any sense, the administration of these courts. They simply remove the present officers and appoint new ones, under the pretext of substituting appointment for election, as to the justices, leaving the subordinates to be appointed as before. The title recognizes and treats the courts as completely organized, and proposes only to regulate their administration, not interfering with their organization. Its subject is the courts, not the justices. Its profession is reform in service, not revolution in office. To be sure, better administration may or may not be attained by changing the incumbents, but that is not the natural signification of the title, nor would it, in that sense, fulfill the object of the constitutional provision. One of its purposes was to notify the people of the true nature of the proposed legislation. That is not secured by this title. No one would imagine that the mode of reaching better administration would be by removing officers, and subverting the elective policy of the State. If that could be done, still, the elective character of these officers had been settled by the current of legislation, and none would suspect that it was to be fundamentally changed, under the pretense of promoting better administration. The latter idea is associated with form, modes

of proceeding, speedy justice—not with appointments and party spoils.

If, as professed in debate, the design was to repudiate the practice of an elective judiciary, in its local application, the title should have expressed it. That subject was of sufficient consequence to attract general observation. It was enough so, in view of the framers of the Constitution, to demand the deliberate consideration of two successive legislatures, followed by the voice of the electors of the State. If this act be maintained, it presents the singular anomaly of an important class of judicial officers, elective in the country and appointable in cities ; because it cannot be denied that police justices exert the ancient and more important functions of justices of the peace. Changes thus important and radical should not be accomplished by deception. It was one object of the Constitution, in the respect considered, to prevent this fraud. It has failed, or this act of 1873 must fall.

*John K. Porter, Dorman B. Eaton,* and *James M. Smith* for respondents.

DALY, Chief Justice.—As preliminary to considering the question discussed upon this appeal, it will be necessary to inquire into the history as well as the nature of the office of justice of the peace in this State, as it has existed from the colonial period.

Under the digest or code of laws known as The Duke's Laws of 1664, justices of the peace were commissioned for the various towns in the colony of New York, who, whilst clothed with all the powers of justices of the peace in England, had, under the code above referred to, also a civil jurisdiction.

The province was divided into three ridings, and in each riding there was a Court of Sessions held by the justices of the peace living within the riding. It was a court of both civil and criminal jurisdiction, and also a Court of Probate. It had jurisdiction of all civil actions, and of all criminal offenses except such as were to be tried by the Court of Assize, or for the trial of which a Court of Oyer and Terminer had to be com-

missioned. This court was held by the justices of the peace living within the riding, the oldest justice being the chief presiding officer, and there was in addition the Court of Assize, for the whole province, held once a year by the governor and council and such of the justices of the peace of the different ridings as saw fit to attend it (Historical Sketch of the Judicial Tribunals of New York from 1623 to 1846, N. Y., 1855; 1 E. D. Smith, pp. 23, 24; The Duke's Laws in Coll. of Hist. Society, vol. 1, pp. 305 to 342; Rec. of Wills in N. Y. Surrogate's Office, vol. 1).

In England, the office of justice of the peace was exclusively connected with the administration of the criminal law. The officers known by this designation were originally persons commissioned by the king to act as guardians or conservators of the public peace within certain territorial limits, by the act of 1 Edw. III, c. 16. By subsequent enactments, their powers were enlarged. By the 18 Edw. III, stat. 2, c. 2, two or three of them might be assigned in any county, to hear and determine offenses against the peace, and to inflict punishments according to law, and by the 34 of Edw. III, c. 12, they received the name, by which they were subsequently known, of justices of the peace, a name which distinguished them from other judicial officers having authority before and afterwards to exercise the same powers (Lambard's Eirenarcha, b. 1, c. 3; 9 Dalton's Justice, c. 2; 2 Reeve's Hist. of Eng. Law by Finlayson, pp. 328 to 332).

But justices of the peace in New York have always had, and have still, authority to try civil actions. They exercised this authority from the beginning as members of the Court of Sessions and of the Court of Assize, which was alike a court of original and of appellate jurisdiction. Originally, there was a local town court, held by the constable and overseers of the town, for the trial of civil actions to the value of forty shillings; and by the justice to the value of £5. When the judicial system of the colony was reorganized in 1683, this court was held by persons commissioned by the governor, and when the act of May, 1691, was enacted, creating a Supreme Court and a Court of Common Pleas for the counties, it was enacted

that this local town court should be held by a justice of the peace, together with a freeholder of the town, who were conjointly empowered to try actions of debt or trespass, to the value of forty shillings, without a jury. By the act of Dec. 16, 1723, the assistance of the freeholder was dispensed with, and by the act of the 12th of March, 1772, the jurisdiction of a justice of the peace, in the determination of these small causes, was enlarged to £5. By the act of 1691, the Court of Common Pleas in each county, except the counties of Albany and New York, was held by a judge, commissioned by the governor, together with three justices of the peace; and by the act of 1683, courts of oyer and terminer, when commissioned, were to be held by a judge and four justices of the peace of the county, commissioned for that purpose. At the time of the Revolution, therefore, a justice of the peace had the same powers, as a conservator of the peace, which a justice of the peace in England had, and, as a member of the Court of Sessions of the county, he discharged duties analogous to those of the justices of the Court of Quarter Sessions in England. In addition to this, he held the local town court for the trial of civil actions of the value of £5, and, if commissioned, sat as a member of the Court of Common Pleas and of the Court of Oyer and Terminer for the county (Bradford's Laws of New York for 1694, p. 1; see the same statute in appendix to 2 Paine & Duer's Practice; Acts of 1683 and 1699; 2 Rev. Laws of 1813, Appendix, Nos. 4 and 5; Livingston & Smith's Laws, vol. 1, p. 237; Kent's Notes to Charter of New York City, p. 262).

This judicial organization was never, so far as respects the office of justice of the peace, applied to the city and county of New York. The organization which existed there was from the beginning, and has always been, distinct and different. It was not only different in its origin, but in most of the acts of a general character above referred to declaratory clauses were inserted, that this local organization in New Nork should not be affected by anything therein enacted. When the colony passed into the hands of the English, in 1664, the Dutch municipal court which then existed in the city was retained, its

name being simply changed from the Court of Burgomasters and Schepens to the Mayor's Court and Court of Common Pleas, the mayor taking the place of the two burgomasters, and the aldermen that of the schepens—these municipal officers being, in both countries (Holland and England), substantially the same. This tribunal, under the Dutch, was a municipal council as well as a court of criminal and civil jurisdiction, and it continued to be so under the English until these powers were finally separated (Appendix to 3 Daly's Rep.; *Case of the Brick Estate*, 15 Abb. Pr. 12; Historical Sketch, &c. 1 E. D. Smith, pp. 25, 26, 33; Dongan's Charter of 1686, § 15).

The municipal government of the city was established by Governor Nichols, in 1665, by the appointment of the mayor and of an alderman for each of the five wards into which the city was divided. It was simply the institution of the municipal system of England as it prevailed in the English boroughs and cities, the mayor and the aldermen acquiring by the grant or commission appointing them, as incident to their offices, all the power and authority of justices of the peace (Lambard, &c. 26; Dalton, &c. c. 23); and it was as such, *ex officio*, that they sat as members of the Court of Sessions. Upon the re-establishment of the municipal government by Governor Andros, in 1675, he conferred upon the city government "full power and authority to keep courts, administer justice, and rule and govern the inhabitants according to the laws of the province and the *privileges and practice of the city*" (2 Rec. of Mayor's Court). The mayor and any four of the aldermen were authorized to sit as a Court of Sessions, but they did not organize any separate criminal tribunal, but discharged civil, criminal and municipal business at the same session (Historical Sketch, &c. p. 30). They also sat after this period as members of the Court of Assize, being *ex officio* justices of the peace (Ib. 29). When the charter, known as the Dongan Charter, was granted to the city, in 1686, a separation was made between the legislative and judicial functions, as well as of the civil and criminal jurisdiction of the mayor, the recorder and the aldermen. Three tribunals came into existence, composed of the same officials: 1. The common council, in

which was vested the power to pass laws and ordinances for the government of the city ; 2. The Court of Common Pleas, or Mayor's Court, for the trial of civil actions; and the Court of Sessions, for the trial of petty larcenies and other offenses, which was held by either the mayor or the recorder and three or more of the aldermen—the office of recorder having been previously added to the local organization by Governor Dongan in 1683.

It was provided, both by this charter and by the Montgomery Charter of 1730, that the mayor, recorder and aldermen should be *ex officio* justices of the peace within the city's limits, and should, as such, hold General Sessions of the Peace, or what was then in the colony and in England known as the Quarter Sessions, and should also sit in the court of Oyer and Terminer when it was held in the city (Kent's Charter, pp. 25, 30, 33, 116, 118, 291).

By the Montgomery Charter, a court was created in the city for the trial of small causes with or without a jury, where the value did not exceed forty shillings, which was held once every week by the mayor, the recorder, or one of the aldermen. In 1737 the amount was enlarged to five pounds. This was the nature of the local organization, which existed until after the Revolution. The mayor, recorder and aldermen had, as incident to their office, all the powers of justices of the peace. As justices of the peace, they sat in the Court of Sessions and in the Oyer and Terminer ; whilst in the exercise of a civil jurisdiction they held the court before referred to for the trial of small causes, and sat as members of the Mayor's Court or Court of Common Pleas. There was not, as in the other counties, and never has been in the city and county of New York, except for a short period of three years, any separate and distinct office known by the title of justice of the peace ; but the powers exercised by justices of the peace in other parts of the State have always, as respects the city and county of New York, been vested in other officers as incident to their office, namely, in the chancellor, the justices of the Supreme Court, the mayor, the recorder, the aldermen, and in certain officers subsequently created, distinguished by a specific name, and invested by stat-

ute with a portion of the powers appertaining to justices of the peace in other counties.

The Constitution of 1777 provided that justices of the peace should be commissioned by the governor every three years ; and in 1787 an elaborate act was passed (2 Jones & Varick's Laws, p. 9) recognizing their civil powers and regulating their criminal jurisdiction. In this act, the mayors, recorders and aldermen of the cities of Albany and New York are separately distinguished as officers having the authority of and *acting* as justices of the peace ; and in the last section of the act it is declared that they shall have the like powers in their respective cities "as the justices of the peace have in their respective counties by virtue of this act." The justices of the peace of the other counties have from that time to the present remained as distinct and separate officers exercising the powers of conservators of the peace within their respective counties, and holding the courts known as and called in the Revised Statutes (vol. 2, p. 225, § 52 ; Id. p. 7, § 64) " courts of justices of the peace," for the trial of civil actions. The provision of the Revised Statutes defining the civil jurisdiction of the justices of the peace authorized to hold courts in the other counties, and regulating the course of procedure, is entirely distinct and separate from the provisions relating to courts of similar character in New York and other cities. They are grouped under different titles, the one being denominated " courts held by justices of the peace," and the other " special justices' courts in the several cities of this State," the cities referred to being New York, Albany and Hudson, and the provisions relating to the one have no application to the other (2 Rev. Stat. 220 ; title i, 224; titles iii, v).

This distinction was not created by the Revised Statutes, but, as respects the city and county of New York, had existed, as I have said, before the Revolution, and had continued unchanged when the Revised Statutes were enacted. In 1787 the act was passed long after familiarly known as the ten pound act (2 Jones & Varick's Laws, p. 155), by which justices of the peace were empowered to try civil actions where the sum demanded was of that amount or under, and prescribing the whole

course of procedure in such actions. By the 20th section of this act, the governor was empowered, with the consent of the council of appointment, to appoint so many proper persons in the city and county of New York as they might think necessary to try civil causes under this act, by the "*name of assistant justices*," who, it was declared, should be vested with the same powers, in the city and county of New York, as were by the act vested in justices of the peace in the several counties. After the passage of this act, a doubt arose whether the aldermen could not act under it, being *ex officio* justices of the peace —that is, whether the newly appointed assistant justices were not, in fact, officially justices of the peace, so as to entitle those who were *ex officio* justices of the peace to exercise this jurisdiction. To put an end to that assumption, an act was passed in 1791 (2 Greenl. Laws of N. Y. p. 345) declaring that the power conferred by the previous act was to be exclusively exercised by the assistant justices created by it; and they continued to hold what was known as the "assistant justices' court" until 1797.

It would extend over too large a space to refer to the various enactments that have since been passed in relation to these courts, thereafter successively known as "The Justices' Courts," "The Assistant Justices' Courts," "The Justices' Courts," and the "District Courts," their present appellation. They have during this period been six times remodeled, to say nothing of various other statutes enlarging, diminishing, or affecting their jurisdiction. Mr. Graham, writing of them in 1839, after they had then been remodeled four times, says: "In every instance, so entire has been the departure from the plan previously existing, that the most ingenious mind will find itself baffled in attempting to trace even the slightest resemblances between the form and character with which they have been from time to time invested" (Graham on Jurisdiction, p. 35, note 1). Mr. Graham, after observing that it may, upon a cursory perusal of the statutory enactments, appear that "a great similarity exists between the jurisdiction of these courts and that of justices of the peace, arising as well from the express words of the statute applicable to both of them, as from the fact

that, in the local districts to which they respectively belong, they are designed to form the same relative branches of legal jurisdiction," says that "In their minute organization, however, differences exist which would readily escape the superficial observer, not merely in regard to their general powers, but in respect also to the incidents of their jurisdiction;" and he points out in what these differences consist, one of which will serve for illustration, that the assistant justices have, by the acts of 1807 and of 1813 recreating these specific courts, jurisdiction in actions of account, which justices of the peace never had.

I have remarked that there was in the city of New York, for the short period of three years, offices denominated by the statute "justices of the peace." This took place in 1804. In that year the ten pound act, so far as it related to the city of New York, was repealed, together with three intermediate acts, and the governor was authorized to appoint eight justices of the peace for the city of New York, who were to hold two courts in the city for the trial of civil actions to the value of $50, and who were to have all the powers and privileges of justices of the peace in the keeping of the peace, but were not to sit in the Court of Sessions. It was in fact a city and not a county office, and lacked a very important part of the powers of a justice of the peace, the right to sit in the sessions (3 Web. Laws of N. Y. p. 437). This act was repealed in 1807. (Laws of 1807, p. 154) by an act which empowered the governor to appoint a person for each of the wards of the city of New York, "to be known and distinguished by the name of *assistant* justices of the city of New York," who were empowered to try certain specified civil actions, where the amount did not exceed $25, and generally such actions as were cognizable before justices of the peace. And by the same act the "Justices' Court" was created, consisting of three justices commissioned by the governor, which was the origin of the present Marine Court. It was declared by an act passed in 1818 (Laws of 1818, p. 287), that the assistant justices should have the like jurisdiction and powers as justices of the peace; and by an act passed in 1820 (Laws of 1820, p. 5, § 10), that they should have

and respectively exercise the powers of justices of the peace. This did not, however, give them the powers of justices of the peace in other counties, for they never sat in the sessions, or in any other criminal tribunal of the city or of the county. I presume that the intention of these enactments was to confer upon them the same powers as conservators of the peace, as had been previously conferred by the 54th section of the act of 1807, above referred to, upon the three justices of the justices' court; for I am not aware that they did, or ever claimed to exercise any other. Powers of a like character were conferred when these courts were again remodeled and denominated District Courts in 1857 (Laws of 1857, vol. 1, pp. 727, 728, § 77).

I have already pointed out that when it was claimed that officers who were justices of the peace *ex officio* were entitled to exercise under the ten pound act the powers of the assistant justices, an act was passed giving a legislative construction to the section of the ten pound act creating these assistant justices, by declaring that it should not be competent for the justices of the peace *ex officio* (the aldermen) to exercise any of the powers of the assistant justices. In *Van Lew* v. *King*, 3 Cow. 375, it was held that a provision in an act of 1818, and in an act of 1824 (acts extending the jurisdiction of justices of the peace to $50), which deprived a plaintiff of costs in a court of record, if the action might have been brought before a justice of the peace, by virtue of these acts, did not apply to the city and county of New York, because the first section of the last act of 1824, enumerating the jurisdiction, contained the words, "the city and county of New York excepted," although the provision under construction was contained in the 33d section of the act, and, as was urged with a great deal of force before the Supreme Court, might have been applied independently of the first section; for the assistant justices in the city of New York had, when this provision was enacted, and before it, jurisdiction to the same extent, $50. It has also been held that these courts, both when they were styled "Assistant Justices' Courts" and "District Courts," were not under the code "courts of justices of the peace,"

the language of the code being interpreted in connection with previous and subsisting laws relating exclusively to the city and county of New York (*Boston &c. Mills* v. *Eull*, 35 How. Pr. 298; 6 Abb. Pr. N. S. 319; *Mills* v. *Winslow*, 2 E. D. Smith, 18; *Thompson* v. *Sutphen*, Id. 527; *Jackson* v. *Wheedon*, 1 Id. 141). So far, therefore, as respects the civil jurisdiction exercised by justices of the peace in other counties, it has in this city been exercised as incident to other offices or by officers separately created and designated by another name.

This has also been the case in respect to the criminal branch of the jurisdiction of justices of the peace in other counties. A police office was established in this city in 1798, an organization distinct and different, in the administration of the criminal law, from that which prevails in the counties where there is a justice of the peace. This act (1 Andrews' Laws, 282) authorized the chancellor, the justices of the Supreme Court, the mayor, the recorder, and the alderman, " whenever they should deem the occasion to require it, to be in said office, and do whatever act they should deem requisite as conservators of the peace ; " in addition to which it created two justices, to be appointed by the governor, each of whom it declared should be denominated in his commission, a *special justice* for preserving the peace in the said city, who should, within the city, execute " the like authorities which are by law vested in justices of the peace as conservators of the peace," which was but a limited part of the powers vested in a justice of the peace as a criminal magistrate. In 1813, the number of these special criminal justices was increased to three (Davies' Laws, p. 469), and this organization continued until 1848, when an act was passed (Valentine's Laws, p. 583) dividing the city into six districts, for each of which a police justice was created, to be elected by the electors of the district, their election being obligatory by the Constitution of 1846, which act declared that the police justices created by it should have all the powers and perform all the duties of the former special justices. In 1857, two police justices were empowered to hold the Court of Special Sessions, which number was, in 1858, increased to three, and after being reduced to two from certain specified districts, was again, in 1870, in-

creased to three (1 Laws of 1857, p. 890; of 1858, p. 441; of 1865, p. 1132; of 1870, p. 103). In 1860 they were all organized into a board known as "The Board of Police Justices of the city of New York," which board was clothed with certain specific duties in relation to all the police courts and for the better maintenance of morals and order in the city. In 1865, the number was increased to eight, and in 1869 to ten (Laws of 1865, p. 1397; of 1869, p. 854). There have been other enactments respecting these officers, but it is not material to refer to them.

The police justice of the city of New York, as the office existed at the adoption of the amendment of the Constitution in 1869, was an officer exercising a limited criminal jurisdiction, which had been exercised *ex officio*, so far as respects the city and county of New York, from 1664 to 1798, exclusively by the chancellor and the justices of the Supreme Court, and by the mayor, deputy mayor, recorder, and aldermen of the city, and which was after that time conferred upon an officer specially created for the city, and known for fifty years by the title of *special* justice, and afterwards and down to the present time, as police justice; the first presiding over what was known until 1848 as the police office, and after that as the police court. It is an office which has from the time of its creation in 1798, been distinct from and known by a different title than that of the office of justice of the peace, a distinction that was recognized in the Constitution of 1822 (§ 14), which declared that the *special* justices and the *assistant* justices and their clerks, *in the city of New York*, should be appointed by the common council, a distinct and different provision being made for the appointment of justices of the peace. The 7th section of the 4th article provided that the supervisors " *of every county in the State* " and the " judges of the respective county courts " might appoint justices of the peace in a manner therein specified, and that if they failed to agree the governor might appoint. Now, there was then a board of supervisors and a county court for the county of New York, as well as for the other counties; but this provision was never regarded as applying to this county, nor was any such appointment ever made here. In

1826, by an amendment of the Constitution, the justices of the peace in the several towns were elected, but the special and the assistant justices of the city of New York continued to be appointed by the common council of the city until after the adoption of the Constitution of 1846, which made all judicial officers of cities and towns elective (§ 18), and in that Constitution the distinction referred to was recognized, the election of justices of the peace in towns being separately provided for. Indeed, as showing that under that Constitution, the distinction between police justices and justices of the peace in cities was well understood and acted upon by the Legislature, the act of 1848 (Laws of 1848, c. 155,) may be referred to, which provided for the election of *one police justice* and " four justices of the peace " for the *city* of Schenectady.

My attention was called, upon the argument of this appeal, to a letter written by me and printed as an appendix to the 3 Daly R. 347, which was sent to a court in Virginia in answer to the inquiry whether Judge BRADY had authority to take an acknowledgment of a mortgage in this city as a justice of the peace. In this letter I stated that as a judge of the Court of Common Pleas he was *ex officio* a justice of the peace, authorized to do, within the limits of this city and county, anything which a justice of the peace can do. I went into a lengthened historical examination to show that the judges of this court have always had, within the territorial limits of the court, all the power and authority which a justice of the peace had from the earliest institution of that office ; and that when a statute of Virginia declared that an instrument might be acknowledged in another State before a justice of the peace, that it was sufficiently acknowledged, if taken before an officer clothed with all the power and authority of a justice of the peace, although known by another name—that is, by an officer holding another office, but who, as incident to that office, may act as a justice of the peace. Whether I was right or wrong in that conclusion I do not see that it has any material bearing upon the inquiry before us, which is, whether the police justice and the justice of the peace are two offices, or the same office.

That they are not the same office, but distinct offices, I

think sufficiently appears by the lengthened investigation I have gone into, and is supported by the decision of the Court. of Appeals, in *Sill* v. *The Village of Corning* (15 N. Y. 297), and *Brandon* v. *Avery* (22 N. Y. 469). I shall now briefly refer to some of the points relied upon by the appellants. *First*, it is said, that the police justices and District Court justices combine all the powers of justices of peace in the country. I have, in the previous examination, shown that this is not so. That District Court justices and police justices have powers which justices of the peace in other counties have not, and that justices of the peace have powers which the others have not. *Second*. All that was decided by the Court of Errors in *Clark* v. *The People* (26 Wend. 599), was, that the provision made in the Constitution of 1822, for the appointment of justices of the peace *in towns*, did not preclude the legislature from directing how justices of the peace should be appointed *in cities*. Justices of the peace in cities, constituting a class of officers for whose appointment no constitutional provision existed, except a general one giving the power to the legislature, I fail to see what bearing this decision has upon the question before us, or the passage quoted from the opinion of Senator Ely. It was simply that the provision in the Constitution, declaring that the governor should appoint all judicial officers except justices of the peace, was general and not limited to justices of the peace in towns, which was no doubt correct, for there was then, as is stated in the case, *sixteen* justices of the peace in cities other than the city of New York, for whose appointment the Constitution had made no provision, except the general one before referred to. Neither the case nor their remarks have any bearing upon the question as respects New York, that city having been specifically provided for by the provision in the Constitution already referred to. *Third*. The decision in *The Matter of Walker* (3 Barb. 162), was, that a provision applicable to the justices and clerks of the *Marine Court*, in an act entitled an act in relation to *justices* and police courts in the city of New York, did not render the other parts of the act unconstitutional, even if that provision were not embraced in the title. Judge HURLBURT thought that it was;

that it was embraced by the words " Justices' Court." Whether he was right or not in that conclusion I shall not pause to inquire. The remark was *obiter*, made without any examination of, or at least without any reference to the numerous statutory enactments relating exclusively to this city ; and even if it were correct, it would not reach the point involved here. *Fourth.* The observation that if the police justices are not justices of the peace, the evil result would follow, that there has not been since 1848 any lawful Court of Special Sessions, and that all convictions since that period for petty offenses have been irregular, is wholly without foundation. The special sessions is an inferior branch of or subordinate tribunal of the general sessions, which has been in existence for nearly a century and a half, for the trial of misdemeanors and petty offenses, which are tried there without a jury, unless the accused demands one, which court, until 1857, was held by the mayor, the recorder, a judge of the Court of Common Pleas or the city judge, together with two aldermen. The charter adopted in that year took away from the aldermen the right to sit as judges in the criminal courts, and provided that the special sessions should be held by any two police justices of the city, and that the court, *when so* ʜᴇʟᴅ, *should have all the powers and jurisdiction appertaining to it by law* (Amended Charter of 1857, § 48); and the Legislature had under the Constitution, the power to confer this jurisdiction (*Nelson* v. *The People*, 23 N. Y. 293). The eminent counsel by whom this point was taken, supposes, as he states, that the jurisdiction and powers of the police justices as judges of the special sessions are derived from their character as justices of the peace; but it is evident that his attention has never been called to this provision in the charter of 1857.

In the amendment of the judicial article (Art. VI) of the Constitution, adopted in 1869, it is declared (§ 18) that judicial officers not therein provided for shall be elected or appointed as the Legislature may direct. That the electors of the several towns shall, at the annual town meeting, elect justices of the peace ; that justices of the peace and *District Court justices*, shall be elected in the different cities of the State, and that *all other*

judicial officers in cities whose election or appointment is not provided for in the amendment shall be chosen by the electors of cities, or appointed by the local authorities thereof. If there were no justices of the peace in any of the cities of the State, it might be claimed that this provision was intended to embrace officers discharging in cities analogous duties, though known by a different name; but there were, at the time of the framing of this amendment, justices of the peace in other cities of the State, so as to give full effect to this · provision without extending it to officers in the city of New York, known by a different name, who perform in part duties which are discharged by justices of the peace in other counties or in other cities.

After the judiciary article was reported to the convention by the judiciary committee, Mr. Murphy proposed an amendment by which justices of the peace and police justices in cities were made elective, which was carried. A few days after, he moved to reconsider his own motion which being carried, he submitted another amendment by which the words " police justices " were stricken out, and the words inserted in their place, " District Court. justices "—a change which he said had been made after submitting this amendment to the gentlemen interested in the question in the city of New York, and, as he believed, all others who taken any interest in it; that with their assent he had *modified* the original amendment, and that as *so modified*, he believed it would be acceptable to all. He also stated that he had originally supposed that district justices of the city of New York were justices of the peace, and were included within that denomination, as expressed in the amendment, but that it appeared that they were considered otherwise. He was asked by Judge Verplanck why he moved to strike · out the election of police justices by the people of cities, and Mr. Murphy answered that he did so as a *matter of compromise*, in order to save the District Court justices of the city of New York, who were of civil jurisdiction—that is, as I interpret his language, that he meant to substitute District Court justices, who exercised only a civil jurisdiction, for police justices who were criminal magistrates; that the compromise,

which was the result of the conference to which he refers, with gentlemen from New York and others interested in the question, was to provide for the election of the District Court justices of New York, who had been omitted, and to leave the election or appointment of the inferior criminal magistrates in that city, and in other cities, to the Legislature. Judge Verplanck, after this explanation, thought it was unnecessary to agree to any such compromise. He said that the police justices of the city of Buffalo had been elected for many years; that there was no complaint, and that he knew no reason why the election of these officers should be changed and made subject to the appointment of the Legislature. Mr. Murphy replied that "it does not follow that it shall be," to which Judge Comstock added, "It will be left just where it is."

It is claimed, on the argument of this appeal, that these last two observations were equivalent to saying that the police justices were justices of the peace, and as such were included under that title in the amendment. If that were so, then it is difficult to understand what Mr. Murphy meant by a compromise; because if both the police justices and the District Court justices were included in the modified amendment as offered, there was no compromise at all. If such were the understanding, it would have been a very simple thing to have said that the police justices were embraced by the title justices of the peace, when Judge Verplanck put the question, "What becomes of the police justices?" (Debates in Constitutional Convention, vol. 5, pp. 3847, 3848). But the construction of the Constitution is not to depend upon what Mr. Murphy may have said or what Judge Comstock may have thought. They cannot be regarded as representing what was the understanding of the sixty-six members that voted for and the twenty-two that voted against this modified amendment. I was one of that number, and know what my own views were, and I think I remember how Judge Verplanck voted. But it is not in any such way, or by what particular members may have said in debate, that a constitutional provision is to be interpreted. It was the act of many minds, and it is the language by which they have expressed their intention, that is to be looked to.

Where that is unambiguous, a constitutional provision is to be viewed in connection with the state of things existing when it was enacted; and when it refers to a particular office or thing by name, it is to be understood as meaning that office or thing, and not something else or something more. It is to be presumed to have been passed with reference to, and to imply, a knowledge of existing laws; and where there was, when this constitutional amendment was framed, a well known office in nearly every county of the State, which had been known in the colony and the State for two hundred and four years by the specific designation of "justice of the peace," it must be understood that it is that office, and no other, that is meant, when it is specifically referred to by name; and that in a county where there was no such office by name, that it did not mean to include offices there of a different name, because they were created to exercise in part the functions of a justice of the peace. Here there is no ambiguity of language, for a well known office is designated by name; and even where there is ambiguity or doubt, the rule in the construction of constitutions is to hold the provision to mean what the words most aptly and directly express (Story on the Constitution, vol. 1, pp. 340, 342; *Gibbons* v. *Ogden*, 9 Wheat. 188). To declare an act of the Legislature unconstitutional and void is, in the language of Chief Justice Marshall, at all times a question of much delicacy, which ought seldom, if ever, to be done in a doubtful case; that it is not upon slight implication or vague conjecture that the Legislature is to be pronounced to have transcended its powers (*Fletcher* v. *Peck*, 6 Cranch, 128). Its authority is absolute and unlimited, except by the express restrictions of the fundamental law (*Bank of Chenango* v. *Brown*, 26 N. Y. 469); and it must be clear, obvious and plain, beyond any reasonable doubt, that it was restricted from doing what it has done, before its enactment will be declared void (*Cochran* v. *Van Surlary*, 20 Wend. 382, 383; *Clark* v. *The City of Rochester*, 24 Barb. 470; *Wollington* v. *Petitioners*, 19 Pick. 95; *Newell* v. *The People*, 7 N. Y. 9; *The People* v. *Fisher*, 24 Wend. 220; *Ex parte Collum*, 1 Cow. 564). This is a sound and safe rule, and if departed from, by applying

such tests as the spirit, the general intention, &c., constitutions may be made to mean anything that judicial tribunals think proper to declare. It is a rule of construction, settled by numerous adjudications, and in its application is, in my judgment, decisive in this case. If the office of police justice in the city of New York is included in that of justice of the peace, then the office of District Court justice is equally included, for all that is or can be relied upon to warrant that conclusion in respect to the one applies with equal force to the other, and in that view there was no occasion whatever for Mr. Murphy's subsequent modification of his amendment. The conclusion would then have to be, that the reconsideration of his amendment was not required, and that he subsequently offered, and the convention adopted, a provision in respect to District Court justices, which was wholly unnecessary. In my judgment, justices of the peace, District Court justices and police justices of the city of New York are distinct officers, and that the latter are not embraced under the title of justices of the peace in the amendment of the Constitution of 1869.

The remaining objection, that the subject of this act is not embraced in its title, I shall dispose of very briefly. It is entitled " An act to secure better administration in the Police Courts of the city of New York." It has been held that the design of this constitutional provision in respect to local acts was to prevent the uniting of various objects, having no necessary or natural connection with each other, in one bill (*Conner* v. *The Mayor &c. of New York*, 5 N. Y. [1 Seld.] 293), and that it is sufficient that the title describe the object to be accomplished, without specifying the means (*The People* v. *Lawrence*, 36 Barb. 190). This court cannot, nor can any court judicially say, that the object of this act is not to secure better administration in the police courts of this city, or that any one of its provisions in respect to the police justices is not expressed by or embraced within that object. It is only in respect to the police justices that the inquiry is material, for it is well settled that an act may be void in respect to provisions not expressed in its title, and be constitutional in respect to others that are (*The People* v. *Buel*, 46 N. Y. 68, 69). The

appellants chiefly call our attention to the change by which the police justices, instead of being elected in the districts, are thereafter to be appointed by the mayor—a provision which may tend to secure the better administration of these courts; at least no court can say, judicially, that it will not, and unless we can say this, we cannot hold that the subject is not expressed in its title. A provision that all judicial sales in this city thereafter, should be made by the sheriff, is not expressed by the title, " An act in relation to sheriffs' and referees'" fees in this city (*Gaskin* v. *Meek*, 42 N. Y. 187); nor a provision relating to the term of office and the time of electing councilmen in this city, by the title, " An act to enable the board of supervisors to raise money by tax," the expenditure of it, the auditing and payment of unsettled claims, and in relation to action at law against the city (*People* v. *O'Brien*, Id. 193); nor a provision reorganizing a city court by the title, " An act to *make further provision* for the government of the county of New York " (*Huber* v. *The People*, 49 N. Y. 133); the decision in the latter case being put upon the ground that the title clearly indicates merely a revenue act and not any intention to change the character of the government of the city in any way, or to amend the charter. That the words in the title to *make further provision*, indicate only to provide means or supplies. This, I think, was going very far. I do not mean thereby to question the correctness of the decision, but to point to it simply as an extreme case, and if the construction of this provision in the Constitution is to be carried farther by holding that the words to "*secure better* administration in the police courts " does not indicate any intention to change these courts in any particular, or the office of those that are to hold them, it must be left to the court of last resort to put that extreme construction upon the act in connection with the constitutional provision. In the recent case, *Matter of Mayor* (50 N. Y. 504), it was held by Chief Justice CHURCH, in delivering the opinion of the court, that the Constitution does not require that the title of an act should be the most exact expression of the subject; that it is enough if it fairly and reasonably announces it, and if the subject is a single one, and the various parts have respect or relate

to that subject, the Constitution is complied with. The subject in this case is a single one, to secure a better administration in the police courts, and, as I have already stated, we cannot say that a provision substituting an appointment by the mayor, instead of the election of these inferior criminal magistrates in the districts of the city where these courts are situated does not relate to that subject.

ROBINSON and J. F. DALY, JJ., concurred.

Judgment affirmed.